**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| Gregory Esparza, | ) | CASE NO. 3:96 CV 7434 |
| | ) | |
| Petitioner, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM OF OPINION |
| Carl Anderson, Warden, | ) | AND ORDER |
| | ) | |
| Respondent. | ) | |

**CHRISTOPHER A. BOYKO, J:**

I.    **Introduction**

This matter is before the Court upon the parties' cross-briefs (ECF # 170, 174, 178, 179)

regarding the nature and scope of the Court's authority to revisit this Court's October 13, 2000

Memorandum of Opinion & Order (ECF # 132) granting Esparza's Petition for Writ of Habeas

Corpus, in light of the Supreme Court's recent decision in *Cullen v. Pinholster,* 563 U.S. ----,

131 S.Ct. 1388 (U.S. 2011).

For the following reasons, the Court finds it has the authority to re-evaluate that portion

of this Court's prior Opinion & Order granting Esparza's Petition for Writ of Habeas Corpus

with respect to Esparza's claims that (1) the trial court violated his constitutional rights when it

denied his request for a continuance (Claim 39); (2) trial counsel provided ineffective assistance during the mitigation phase of the proceedings (Claim 44); and (3) there was cumulative error during the sentencing phase (Claim 52).  The Court further finds that, in conducting this review, it is now limited under *Pinholster* to considering only that evidence that was before the state courts, and may not consider any evidence adduced during the evidentiary hearing previously conducted in these federal habeas proceedings.  Upon consideration of these Claims based solely on the state court record, this Court finds they are without merit and denies Esparza's Petition for Writ of Habeas Corpus in its entirety.

II.     **Background**

   A.     **Factual History and State Court Proceedings**

   The Ohio Supreme Court set out the factual history of this case, as revealed by the evidence adduced at Esparza's trial, as follows:

> At approximately 9:30 p.m. on February 12, 1983, a man entered the Island Variety Carryout in Toledo, Ohio, wearing a green ski mask and a dark blue jacket.  The victim, Melanie Gerschultz, and James Barrailloux, both store employees, were the only other persons present and were standing in the back of the store as the man entered.  The man approached the pair, pointed a small black handgun at them and ordered one of them to open the cash register at the front of the store.  Gerschultz complied and walked towards the cash register.  As she opened the register, Barrailloux crouched down and left the store through the rear door, entering the attached home of the store owner, Evelyn Krieger.  While he was alerting Krieger of the robbery, they heard a gunshot.  Barrailloux and Krieger re-entered the store to find Gerschultz lying on the floor with a fatal gunshot wound in her neck. The cash register was open and approximately $110 was missing.  A small round hole was found in the sheet of clear Plexiglas located to the side of the cash register, through which the bullet had apparently passed.

*State v. Esparza*, 529 N.E.2d 192, 194 (Ohio 1988).

On October 13, 1983, Esparza was indicted on one count of aggravated murder and one count of aggravated robbery in connection with the death of Melanie Gerschultz. Esparza pleaded not guilty to the charges and proceeded to trial on May 4, 1984. The jury returned a guilty verdict as to both charges on Thursday, May 10, 1984. Denying defense counsel's request for a continuance, the trial court ordered that the sentencing hearing begin five days later, on Tuesday, May 15, 1984. The jury returned two days later with the recommendation that Esparza be given the death penalty. The trial judge accepted the jury's recommendation and sentenced Esparza to death.

In the years that followed, Esparza attacked his convictions and sentence via direct appeal, post-conviction relief, and a Rule 26(B) Application for Re-Opening. His convictions were affirmed on direct appeal by both the Ohio Court of Appeals and the Ohio Supreme Court. *See State v. Esparza*, 1986 WL 9101 (Ohio Ct. App. Aug. 22, 1986); *State v. Esparza*, 529 N.E.2d 192 (Ohio 1988).[1] Esparza's first and second petitions for post-conviction relief were both denied without an evidentiary hearing. *See State v. Esparza*, No. CR-83-6602 (Ohio Ct. Common Pleas June 18, 1990); *State v. Esparza*, 1992 WL 113827 (Ohio Ct. App. May 29, 1992); *State v. Esparza*, 602 N.E.2d 250 (Ohio 1992). Esparza's Rule 26(B) Application for Relief pursuant to *State v. Murnahan*, 584 N.E.2d 1204 (Ohio 1992) was ultimately denied as well. *See State v. Esparza*, 1995 WL 302302 (Ohio Ct. App. May 19, 1995); *State v. Esparza*, 660 N.E. 2d 1194 (Ohio 1996).[2]

---

[1]  The United States Supreme Court thereafter denied Esparza's Petition for Certiorari. *Esparza v. Ohio*, 490 U.S. 1012 (1989).

[2]  In his *Murnahan* action, Esparza asserted appellate counsel had been ineffective for a variety of reasons. The Ohio Court of Appeals ordered Esparza's direct appeal reopened to consider certain

**B.      Federal District Court Habeas Proceedings Prior to Remand**

On September 5, 1996, Esparza filed his Petition for Writ of Habeas Corpus in this

Court, raising fifty-six (56) claims for relief.  (ECF # 12).  On that same date, Esparza filed a

motion for stay of execution, which this Court granted on September 6, 1996.  (ECF # 11, 13).

Respondent filed his Return of Writ on October 25, 1996 (ECF # 16), and Esparza filed his

Traverse on April 1, 1997 (ECF # 33).

Esparza also filed motions for discovery, to expand the record, and for an evidentiary

hearing.  This Court, through Judge Kathleen O'Malley,[3] allowed Esparza to conduct limited

discovery and granted his Motion for an Evidentiary Hearing.  (ECF # 41).  This hearing was

conducted on August 17 - 18, 1999.  Seven witnesses testified, including one of Esparza's trial

counsel (Keithly Sparrow) and an expert in neuropsychology (Dr. Michael Gelbort).  With

regard to Esparza's claim of ineffective assistance of counsel ("IAC") during the mitigation

phase, the Court summarized the evidence adduced during the evidentiary hearing as follows:

> During the evidentiary hearing held by this Court on August 17, 1999,
> attorney Keithly Sparrow testified about his representation of Esparza
> during the sentencing phase of the proceeding.  Sparrow testified that he
> had not begun preparation for the mitigation phase of the trial until
> Esparza was found guilty, late in the day on Thursday May 10, 1984. The
> sentencing phase of the trial began on Monday, May 14, 1984.  He,
> accordingly, had only a few days, over a weekend, to prepare for the
> mitigation phase.  He requested an independent psychologist to help the

issues relating to an ex parte certification hearing held by the trial judge. *State v. Esparza*, 1994 WL
395114 (Ohio Ct. App. July 27, 1994).  After reopening, the Ohio Court of Appeals reaffirmed the
trial court and the Ohio Supreme Court denied his appeal.  *See State v. Esparza*, 1995 WL 302302
(Ohio Ct. App. May 19, 1995); *State v. Esparza*, 660 N.E. 2d 1194 (Ohio 1996).

[3]      This matter was initially assigned to Judge Kathleen O'Malley.  It was re-assigned to the
undersigned in 2011 after Judge O'Malley was appointed to the United States Court of Appeals for
the D.C. Circuit.

defense with the mitigation proceedings, but did not explain to the trial court why psychological aid was necessary in order to present potential mitigating factors.  The judge, thus, denied this motion.

In the evidentiary hearing held before this Court on August 18, 1999, it was established that Esparza suffers from damage to the frontal lobes of his brain (caused by a traumatic head injury as a child) and that this injury interferes with his ability to properly understand the consequences of his actions before he acts, to plan ahead or to inhibit impulsive behaviors.  Esparza's intelligence level is also on the borderline of mental retardation.  If Mr. Sparrow had investigated Esparza's prior records, he would have discovered this information and been in a position to support his request for an independent psychologist.  He also would have been in a position to share these facts about Esparza with the jury.

After being denied an opportunity to pursue issues regarding Esparza with an independent psychologist, Mr. Sparrow requested a pre-sentence investigation and psychological report.  He did so, however, without doing any independent investigation of Esparza's history and home life, and without understanding that anything included in that report likely would be admitted into evidence. Mr. Sparrow did not collect any information, or give any information to the agency that created these reports.  These reports, which were created in only one day, were furnished to the court during a hearing on Saturday, May 12, 1984.  Mr. Sparrow also made no effort to locate and interview mitigation phase witnesses until after the guilty verdict.  While Mr. Sparrow did call a few witnesses in the sentencing phase, Esparza's grandfather, aunt, brother and foster-parent, he did not interview them beforehand to determine what they might offer the jury by way of insight into Esparza.  Mr. Sparrow also did not call Esparza to present an unsworn statement or apology to the jury during the mitigation hearing, even though Esparza would not have been subject to cross-examination for that statement.  Nor did Mr. Sparrow present evidence of Esparza's remorse for the crime.

(ECF # 132 at 123-139).

In a Memorandum of Opinion & Order dated October 13, 2000 (ECF # 132), the Court

found four of Esparza's fifty-six claims for relief to be well-taken, i.e. Claims 1, 39, 44, and 52.

In these Claims, Esparza argued that (1) the indictment was defective because it failed to contain

all of the elements necessary to charge Esparza with capital murder (Claim 1); (2) the trial court

violated his constitutional rights when it denied defense counsel's request for a continuance to prepare for the sentencing hearing (Claim 39); (3) he was deprived of his constitutional rights in light of the ineffective assistance of his counsel during the mitigation phase (Claim 44); and (4) the convictions and death sentence are unreliable due to cumulative error in the sentencing phase. (Claim 52).

The Court agreed with Esparza as to each of these four Claims and granted Esparza's Petition in part.[4]  Specifically, as to Claim 1, the Court held the indictment in the instant case failed to contain an appropriate capital specification because it did not charge Esparza either with being the "principal offender" or with having committed murder with "prior calculation and design."  The Court further noted that, because the trial court based its jury instructions on the indictment, the trial court failed to instruct the jury that in order to convict Esparza of *capital* murder, as distinct from mere *aggravated* murder, it must find that he was either the principal offender or that he committed the murder with prior calculation and design.  In light of these errors, the Court found that "while Esparza was indicted for, and found guilty of, aggravated murder, the same cannot be said with respect to the crime of capital murder."  (ECF #132  at 74).  The Court then concluded that "the error which infected Esparza's trial by virtue of the defective indictment" was a structural error and the imposition of the death penalty upon him would be unconstitutional.  (ECF # 132 at 77).

With regard to Claim 44 (IAC during mitigation), the Court found defense counsel were "grossly unprepared" for the mitigation phase of the trial and "the failure of defense counsel to

---

[4]    The Court also explicitly considered and rejected Esparza's other 52 claims as being without merit.

-6-

investigate Esparza's background was both objectively unreasonable and prejudicial." (ECF # 132 at 146).  Specifically, the Court ruled that Esparza's defense counsel was prejudicially deficient because he (1) failed to collect records of Esparza's social and medical history; (2) failed to investigate and present mitigating evidence regarding either Esparza's "extremely traumatic and abusive childhood," his brain injury, or his mental deficiencies; and (3) failed to elicit meaningful mitigating evidence from the defense witnesses that were called during the mitigation phase.  In addition, the Court was particularly concerned about defense counsel's "uninformed decision" to request a pre-sentence investigation and psychological report.  The Court noted that defense counsel had failed to understand that the entirety of this report would be introduced as evidence and had failed to provide the Probation Department with any material to be considered in preparing this report.  The Court noted he PSI and psychological report introduced during mitigation was "devastating."  The state psychologists systematically went through each mitigating factor and found they did not apply to Esparza, and further testified there was a high degree of probability that Esparza would commit future criminal acts.  (ECF # 132 at 145).  In light of all of the above, the Court concluded defense counsel's performance was objectively deficient and  "[t]he proceedings here cannot be relied upon to have produced a just result."  (ECF # 132 at 144).

In so finding, the Court relied heavily upon the evidence adduced at the August 1999 evidentiary hearing, summarized above.  Indeed, the Court specifically noted that, while the state courts had refused to hold an evidentiary hearing on this issue because they believed the claim could be determined by reference to the trial court record, "[t]his Court, after conducting its own hearing, finds . . . that the sentencing phase ineffective assistance of counsel claim is

largely based on evidence *dehors* the record."  (ECF # 132 at fn 67).

With regard to Claim 39 (denial of continuance), the Court agreed with Esparza that the

trial court violated his constitutional rights when it denied defense counsel's request for a

continuance to prepare for the sentencing hearing.  While the Ohio Supreme Court had found the

trial court did not abuse its discretion in failing to grant a continuance, this Court held:

> In the rare circumstances of this case, the Court finds the Ohio Supreme
> Court's decision to be an unreasonable application of federal law.  The
> trial judge in this matter was aware both that he had appointed trial
> counsel less than eight weeks before trial was to commence *and* that
> counsel was relatively inexperienced in capital cases when appointed.
> Both of Esparza's trial counsel had only handled one previous capital
> case.  Indeed, the trial court appointed Esparza's counsel after
> experiencing difficulty with getting Esparza's prior counsel to comply
> with the court's trial schedule.  When Esparza's counsel accepted the
> appointment, they did so at the personal request of the trial judge and with
> the understanding that the guilt phase of the trial would commence when
> planned.  The trial court knew that, due to the rigorous schedule it
> imposed on Esparza's counsel, counsel would have little or no time to
> prepare for both the guilt phase and the sentencing phase of the
> proceedings.  The trial court also was aware, when the continuance was
> requested, that trial counsel, in fact, had *not* prepared for the sentencing
> phase of the proceedings.  Rather than allow trial counsel the time to
> prepare themselves so that they could properly investigate both the law
> and the facts necessary to present mitigating evidence on Esparza's part,
> the court showed a 'myopic insistence upon expeditiousness in the face of
> a justifiable request for delay.'  *See Ungar*, 376 U.S. at 590.  The trial
> court, thus, bears at least partial responsibility for Esparza's counsel's
> ineffectiveness during the mitigation phase.  In such circumstances, the
> Court finds it was impermissibly arbitrary for the trial court to deny a
> continuance to allow time to prepare for a portion of the proceedings
> which literally could mean the difference between life and death for a
> defendant.  Esparza's thirty-ninth claim for relief, therefore, is well-taken.

(ECF #132 at 148-49) (italics in original).

Finally, with regard to Claim 52 (cumulative error), the Court found that "Esparza's

counsel's ineffectiveness during the sentencing phase of the trial, coupled with the trial judge's

refusal to provide Esparza's counsel with a continuance to prepare for the sentencing phase of the trial, and the prejudicial effect of the blanket admission of the pre-sentence investigation report, including its psychological aspects, constitute cumulative error sufficient to mandate partial habeas corpus relief."  (ECF # 132 at 150-51).

Based on the above, the Court then issued a writ of habeas corpus as follows: "[t]he respondent shall set aside Esparza's sentence of death and, instead, impose a life sentence under Ohio Rev. Code § 2929.03(A) for aggravated murder with no capital specification." (ECF #132 at 158).

Respondent appealed the Court's ruling with regard to Counts 1, 39, 44, and 52 (i.e. the defective indictment, denial of continuance, IAC during mitigation, and cumulative error claims).  Esparza cross-appealed, raising three grounds on which he asked the court to grant a general writ invalidating his convictions for aggravated murder and aggravated robbery.  These grounds were (1) IAC at trial claims based on defense counsel's failure to interview witnesses (Counts 14, 15, 17 and 19(v)); (2) several *Brady* claims (Count 3); and (3) a claim based on the trial judge's refusal to recuse himself after conducting a witness certification hearing (Count 7).

### C. Federal Appellate Proceedings

On appeal, the Sixth Circuit agreed the indictment was constitutionally defective and affirmed the Court's decision to grant Esparza's Petition in part and vacate the death sentence. *Esparza v. Mitchell*, 310 F.3d 414 (6th Cir. 2002).  In its decision, the court considered only that part of  this Court's decision relating to Claim 1 of Esparza's Petition, (i.e. the defective indictment claim) and expressly stated that "we need not reach the alternate grounds on which Esparza asks us to vacate the death sentence: that he was denied effective assistance of counsel

-9-

at sentencing, that his rights were violated when he was denied a continuance to prepare for the sentencing phase, and that his rights were violated through cumulative error in the sentencing phase." *Id.* at 422.  In addition, the Sixth Circuit considered and rejected each of the three grounds raised by Esparza in his cross-appeal.  *Id.* at 422-425.[5]

The United States Supreme Court reversed, finding that the Ohio courts' decision that the defects in the indictment constituted "harmless error" was not objectively unreasonable, and that the Sixth Circuit had erred in finding otherwise.  *Mitchell v. Esparza*, 540 U.S. 12, 17-18 (2003).  In a footnote, the Supreme Court specifically stated that "[o]ur decision, like the Court of Appeals', is limited to the issue presented here ... We express no view whether habeas relief would be available to [Esparza] on other grounds."  *Id.* at fn 4.  The Supreme Court then remanded the case "for further proceedings consistent with this opinion."  *Id*. at 19.

The case was remanded to the Sixth Circuit.  That court then issued an Order on November 17, 2003, which stated:

>  Having received the Supreme Court's opinion decided November 3, 2003, in the above-entitled case which reverses and remands the case for 'further proceedings consistent with this opinion,' we hereby remand the case to the District Court for reconsideration in light of the Supreme Court's opinion.

*See* 11/17/2003 Order (ECF # 151).  That same day, the Sixth Circuit issued a mandate "pursuant to the court's disposition that was filed 11/17/03."  (ECF # 152).

Esparza thereafter filed a Motion to Recall Mandate, in which he argued the Sixth Circuit "should retain jurisdiction as Esparza won relief on several other issues in the District

---

[5]     Esparza filed a Petition for Certiorari with respect to the denial of these three claims.  (ECF #147).  That Petition was denied. *See* U.S. Supreme Court Docket, Case No. 02-8849.

Court and those issues still need to be addressed by this Court."  (Docket for *Esparza v. Mitchell*, 6th Cir. Case No. 00-4615, Appellee's Motion to Recall Mandate at 2).  Specifically, Esparza maintained that "this Court's mandate contained no directive as to how the other issues on which Esparza was granted relief should be handled," and the need for further briefing and oral argument on these issues was "most appropriately addressed by this Court." (*Id*. at 4).  Respondent opposed Esparza's motion, arguing no extraordinary circumstances warranted reconsideration of the Sixth Circuit's mandate.  (Docket for *Esparza v. Mitchell*, 6th Cir. Case No. 00-4615, Appellant's Response in Opposition to Motion to Recall Mandate).

On December 17, 2003, the Sixth Circuit issued a one-sentence Order denying Esparza's Motion to Recall Mandate.  This Order did not discuss the other issues on which Esparza had obtained relief in this Court's October 13, 2000 Opinion & Order or provide any further guidance as to how this Court should handle these issues on remand.

**D.      Federal Proceedings Post-Remand**

Once the case was remanded to this Court, Esparza moved for a stay to allow him to pursue an *Atkins* claim in state court.  On February 20, 2004, the Court granted Esparza's motion and agreed to hold proceedings in abeyance.  (ECF # 159).  Six years later, the Court removed the case from abeyance and set a status conference for March 30, 2010.  (ECF # 166, 167).

During the status conference, Judge O'Malley asked the parties for an update on the case. Regarding the status of Esparza's *Atkins* claim, counsel for Esparza explained he had determined Esparza's *Atkins* claim was without merit and had voluntarily dismissed it prior to any actual merits determination by the state court.  (Transcript of 3/30/2010 Status. Conf. at 2).  The Court

then asked the parties to "brief the issue of both what you think the scope of the remand is in terms of the Court's jurisdiction, and you can provide me with any supplemental authority that relates to the issues that you believe are still to be alive for this Court's consideration." (*Id*. at 11). Judge O'Malley further clarified that "we should focus on those issues that were decided against the state rather than against the petitioner because I think those clearly have been resolved by my earlier decision." (*Id*.)

Pursuant to the Court's Order, Respondent filed a "Supplemental Answer" on June 15, 2010. (ECF # 170). Therein, Respondent argues Esparza "cannot now justify his claims or bolster his avenues of relief with contemporary legal developments." (ECF # 170 at 3). Relying on numerous recent Supreme Court and Sixth Circuit cases, Respondent then basically reargues the merits of the three additional claims upon which the Court granted Esparza's Petition, i.e. (1) IAC during mitigation, (2) denial of continuance, and (3) cumulative error in the sentencing phase of the trial. Respondent maintains that, under new case law which he believes supports the denial of these claims, this Court should now reverse its prior ruling granting habeas relief and dismiss Esparza's Petition for Writ of Habeas Corpus in its entirety.

In his Memorandum in Re Proceedings on Remand (ECF # 174), Esparza defends the Court's Opinion & Order and asks the Court to (1) reconsider and assess his denial of continuance and IAC during mitigation claims; (2) "re-adopt" the Court's review of these claims; and (3) grant Esparza's Petition for Writ of Habeas Corpus.[6] He argues the law

---

[6] Petitioner concedes his cumulative error claim (Claim 52) is no longer a justifiable basis for independent habeas relief. (ECF # 174 at 16). However, he states the cumulative errors of the state trial court, coupled with defense counsel's deficient performance, are "germane to this Court's review and analysis of the facts underlying Esparza's other remanded claims." (ECF # 176 at 16).

-12-

governing the claims in his case is "little changed" since the Court's prior ruling granting in part Esparza's Petition, and "cases decided since 2000 reinforce this Court's analysis and legal conclusions."  (ECF # 174 at 6).  Esparza then reargues the merits of his denial of continuance and IAC during mitigation claims, and argues this Court should re-adopt its previous rulings and partially grant Esparza's Petition.

On July 20, 2011, this Court ordered the parties to submit cross-briefs regarding the effect, if any, of the Supreme Court's recent decision in *Pinholster* on the instant case, as well as any case law decided since the parties' June 2010 cross-briefing which the parties believe is relevant.  The parties submitted their cross-briefs on "the *Pinholster* effect" on August 29, 2011. (ECF # 178, 179).

In his cross-brief, Respondent argues Esparza's IAC during mitigation and denial of continuance claims were adjudicated on the merits by the state courts and therefore, under *Pinholster*, this Court may not consider any of the testimony or evidence developed in the federal evidentiary hearing.  Respondent points out that this Court's October 13, 2000 Opinion & Order referred repeatedly to evidence obtained during this hearing and argues the Court's determination of Esparza's IAC during mitigation and denial of continuance claims relied heavily on this evidence.  *See* ECF #132 at pp. 120 fn. 67, 122 fn. 68, 123 fn. 69, 125 n. 71, 126 fn. 72, 73, 128 fn. 76.  Viewing these claims in the absence of such evidence as *Pinholster* now requires, Respondent maintains the Court's decision granting relief on Esparza's IAC during mitigation and denial of continuance claims is unsupportable and must be vacated.  (ECF # 178 at 12-18).

Esparza argues generally that *Pinholster* does not apply to (1) any claims that were not

adjudicated on the merits by the state court, or (2) any state court decision which this Court has decided is an "unreasonable application of federal law" pursuant to § 2254(d)(1).  He appears to ask this Court to revisit and reconsider, not just its disposition of Esparza's IAC during mitigation and denial of continuance claims, but nearly all of the grounds for relief raised in his Petition.  Specifically, he asks this Court to find that "there was no decision rendered by the Ohio courts that is subject to the limitations on relief in 28 U.S.C. § 2254(d)," and therefore *Pinholster* does not bar this Court from conducting further discovery regarding Esparza's claims.

## III.   <u>Analysis of the Scope of this Court's Authority on Remand</u>

Prior to reaching the merits of the parties' arguments regarding *Pinholster*'s potential application to this matter, the Court must first determine the threshold issue of the nature and scope of its authority after remand.  For the following reasons, the Court finds it has the authority to reconsider its October 13, 2000 Opinion & Order granting Esparza's Petition with regard to his denial of continuance, IAC during mitigation, and cumulative error during the sentencing phase claims.  The Court further finds it will not revisit its previous rulings as to any of Esparza's other grounds for relief.

While the parties have provided supplemental authority on the merits of the remaining IAC during mitigation, denial of continuance, and cumulative error claims, they did not fully address the issue of the scope of the remand and/or this Court's authority or jurisdiction to revisit its October 13, 2000 Opinion.  Rather, the parties both appear to assume that this Court may now, over eight years after remand, reconsider its previous rulings as to these claims in light of intervening case law.

Moreover, in his recent *Pinholster* cross-brief, Esparza appears to argue this Court is obligated to conduct a more extensive review, and "ascertain which of Esparza's claims were adjudicated on the merits by the Ohio courts, and then, as to each such claim, determine whether, on the record that was before it, the state court's adjudication of the claim was 'contrary to, or involved an unreasonable application of, clearly established federal law' under §2254(d)(1)."  (ECF # 179 at 5).  Esparza maintains that, if this Court makes such a determination, its previous decisions to permit discovery and hold a hearing were sound and "the Court remains free to permit further factual development and/or conduct another evidentiary hearing subject to the Habeas Rules and Supreme Court precedent."  (ECF # 179 at 5).

The Sixth Circuit has made clear that "when a case has been remanded by an appellate court, the trial court is bound to 'proceed in accordance with the mandate and law of the case as established by the appellate court.'"  *Hanover Ins. Co. v. American Engineering Co.*, 105 F.3d 306, 312 (6th Cir. 1997) (quoting *Petition of U.S. Steel Corp.*, 479 F.2d 489, 493 (6th Cir. 1973)). The law of the case doctrine provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Scott v. Churchill*, 377 F.3d 565, 569-70 (6th Cir. 2004) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)).  Regarding the law of the case doctrine, the Sixth Circuit has consistently held that "[a] party that fails to appeal an issue waives his right to raise the issue before the district court on remand."  *JGR, Inc. v. Thomasville Furniture Indus., Inc.*, 550 F.3d 529, 532 (6th Cir. 2008).  The law of the case doctrine, thus, "bars challenges to a decision made at a previous stage of the litigation which could have been challenged in a prior appeal, but were not."  *Id.*

*See also United States v. McCreary-Redd*, 2010 WL 4244124 at *10 (6th Cir. Oct. 15, 2010).

The mandate rule is a specific application of the law of the case doctrine. *Scott*, 377 F.3d at 570.  "The basic tenet of the mandate rule is that a district court is bound to the scope of the remand issued by the court of appeals." *United States v. Campbell*, 168 F.3d 263, 265 (6th Cir. 1999).  The scope of a remand is determined by examining the entire order or opinion, to determine whether and how the court of appeals intended to limit a remand. *Id*. at 266-68. *See also Scott*, 377 F.3d at 570.  To properly assess the scope of the remand, a district court must first determine whether the appellate court issued a limited or general remand by looking at the language of the remand. *United States v. O' Dell*, 320 F.3d 674, 679-80 (6th Cir. 2003).  In general, "[t]he difference between limited mandates and general mandates is the presence of limiting language." *Id*. at 680.  As the Sixth Circuit recently elaborated,

> 'A limited remand must explicitly outline the issues to be addressed by the district court and create a narrow framework within which the district court must operate.' *United States v. Obi*, 542 F.3d 148, 154 (6th Cir. 2008).  'General remands, in contrast, give district courts authority to address all matters as long as remaining consistent with the remand.' *Id*.  Certain factors distinguish between the two types of remands, such as 'whether specific language in the remand clearly limits the scope of the subsequent proceedings, whether the appellate court explicitly articulated the reasons for its remand, whether the appellate court articulated a prescribed chain of events with particularity, and whether multiple issues are involved (which, if present, suggest a general mandate).' *United States v. Guzman*, 48 F.Appx. 158, 161 (6th Cir. 2002).

*McCreary-Redd*, 2010 WL 4244124 at * 11.  Further, the Sixth Circuit has noted that, "[a]s with all applications of the law of the case doctrine, the trial court may consider those issues not decided expressly or impliedly by the appellate court or a previous trial court." *Jones v. Lewis*, 957 F.2d 260, 262 (6th Cir. 1992).

Accordingly, upon remand of a case for further proceedings after a decision by the

-16-

appellate court, "the trial court must proceed in accordance with the mandate and the law of the case as established on appeal . . .  The trial court must implement both the letter and the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces." *United States v. Moored*, 38 F.3d 1419, 1421 (quoting *U.S. v. Kikumura*, 947 F.2d 72, 76 (3rd Cir. 1991)).

Under the unusual circumstances presented herein, the Court finds it has the authority on remand to revisit that portion of its October 13, 2000 Opinion granting Esparza's denial of continuance, IAC during mitigation, and cumulative error claims in light of intervening legal developments.  According to the mandate rule, this Court is governed on remand by the Sixth Circuit's mandate.  This mandate, set forth in that court's November 17, 2003 Order, is relatively broad, stating only that the case is remanded "for reconsideration in light of the Supreme Court's opinion."  (ECF # 151).  The Supreme Court's Opinion addressed only the defective indictment issue and reversed on that basis alone, stating expressly that "[o]ur decision, like the Court of Appeals', is limited to the issue presented here . . . We express no view on whether habeas relief would be available to Esparza on other grounds." *Mitchell*, 540 U.S. at fn 4.  The Supreme Court's mandate to the Sixth Circuit is also broad, stating only that the case is remanded for "further proceedings consistent with this Opinion." *Id*. at 19.

The Court finds the Sixth Circuit's remand is a "general" remand.  It does not contain any specific language clearly limiting the scope of subsequent proceedings, nor does it articulate the particular reasons for its remand or set forth a "prescribed chain of events with particularity." *McCreary-Redd,* 2010 WL 4244124 at * 11.  Rather, it generally gives this Court the authority to address any remaining matters so long as it remains consistent with the Supreme Court's

-17-

opinion.

As an initial matter, this would clearly imply that this Court should vacate that portion of its October 13, 2000 Opinion & Order granting relief on Esparza's defective indictment claim (i.e. Claim 1) for the reasons set forth in the Supreme Court's decision in *Mitchell v. Esparza*, 540 U.S. 12 (2003).  With regard to the remaining issues on which this Court granted Esparza's Petition, however, the Supreme Court issued no opinion, stating that "[w]e express no view whether habeas relief would be available to [Esparza] on other grounds."  *Mitchell*, 540 U.S at fn 4.  This language appears to leave this Court's rulings regarding Esparza's denial of continuance, IAC during mitigation, and cumulative error claims in force.  While Respondent clearly appealed these issues to the Sixth Circuit, that court (in denying Esparza's Motion to Recall the Mandate) determined it would not address the merits of Respondent's appeal or otherwise address these remaining claims.

Had this case returned promptly to this Court for proceedings consistent with the Sixth Circuit's mandate, the Court could have vacated its Opinion & Order with respect to Esparza's defective indictment claim and nonetheless entered habeas relief with respect to his denial of continuance and IAC during mitigation claims.  Indeed, in discussing these claims and finding them to have merit, the Court states in its October 2000 Opinion that "both of these errors provide individual grounds for habeas relief."  (ECF # 132 at 119).  The Court further notes, in discussing Esparza's IAC during mitigation claim that "the Supreme Court has granted habeas relief on facts the Court perceives as less extreme than those existing here."  (ECF #132 at 139).  Finally, the Court notes that, based on its analysis of both claims, "the proceedings here cannot be relied upon to have produced a just result" and that these two grounds "justify the conclusion

that the mitigation phase of the proceedings was constitutionally defective." (ECF #132 at 144).

However, Esparza's counsel decided instead to move to stay the case (which Respondent did not oppose) and the matter was held in abeyance for six years.  Under these circumstances, it seems appropriate that this Court would have, not only the authority, but the obligation to revisit its October 13, 2000 Opinion in light of intervening legal developments.  It was upon Esparza's motion that the case was stayed in the first instance, and neither party suggests in their recent cross-briefs that this Court lacks the authority to reconsider its Opinion in light of intervening authority.

Further, the Court finds it has an obligation to re-examine its previous Opinion given the passage of time.  This Court would not seem to be prohibited from doing so under the Sixth Circuit's mandate, and there does not appear to be any justification for entering an Opinion that may conflict with recent cases.  This is particularly so given that Esparza himself requested the stay that resulted in the six year delay in this case.  In not moving to have the October 13, 2000 Opinion entered as to Claims 39, 44, and 52 immediately upon remand, Esparza's counsel made the strategic decision that a stay would be of greater benefit to his client as he pursued an *Atkins* claim in state court.  Having chosen this strategy, Esparza cannot now argue this Court has no authority to reconsider its previous Opinion as to these two claims in light of intervening case law.

The Court rejects, however, Esparza's argument that it is required to reconsider all of Esparza's grounds for relief to determine whether they have been impacted by the *Pinholster* decision, and to potentially order further discovery regarding other claims not addressed on appeal.  As an initial matter, the Court finds Esparza has waived his right to raise on remand any

-19-

issues which he did not raise during his cross-appeal to the Sixth Circuit.  In the October 13, 2000 Opinion, this Court issued a certificate of appealability as to "all issues raised by petitioner."  (ECF # 132 at 159).  In his cross-appeal, Esparza chose to raise only three claims; i.e. (1) his *Brady* claims (Count 3); (2) his claim based on the trial judge's refusal to recuse himself after conducting a witness certification hearing (Count 7); and (3) several IAC during the guilt phase claims (Counts 14, 15, 17 and 19(v)).  The Court finds Esparza has waived his right to raise on remand any additional issues beyond these three claims.  *See JGR, Inc*., 550 F.3d at 532 ("a party that fails to appeal an issue waives his right to raise the issue before the district court on remand").

As to these three claims raised by Esparza in his cross-appeal, the Court  will not re-consider these claims on remand for the following reasons.  In its decision, the Sixth Circuit expressly considered and rejected these three claims. *Esparza v. Mitchell*, 310 F.3d 414, 422-425 (6th Cir. 2002).  Esparza thereafter filed a Petition for Writ of Certiorari to the Supreme Court regarding the denial of these three claims, which was denied. (ECF #147; U.S. Supreme Court Docket, Case No. 02-8849).  The Sixth Circuit's decision with regard to the three issues raised by Esparza on cross-appeal became final once the Supreme Court denied Esparza's Petition for Certiorari.  Thus, this Court does not have jurisdiction to reconsider those claims on remand.

Accordingly, in light of the above, the Court finds it has the authority under the Sixth Circuit's mandate to reconsider that portion of its October 13, 2000 Opinion & Order regarding Esparza's denial of continuance, IAC during mitigation, and cumulative error claims (i.e. Claims 39, 44, and 52), in light of intervening case law and legal developments.  The Court will not,

however, revisit the October 13, 2000 Opinion & Order with respect to any of Esparza's other

grounds for relief.

**IV.     Analysis of the Law and Evidence Governing this Court's Review under AEDPA**

Having determined it has the authority to reconsider its October 13, 2000 Opinion &

Order with respect to Claims 39, 44, and 52, the Court will now outline the legal standards

governing its review.

**A.     AEDPA Standard of Review**

The Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter the "AEDPA"),

which amended 28 U.S.C. § 2254, was signed into law on April 24, 1996.  The United States

Supreme Court has held the provisions of the AEDPA apply to habeas corpus petitions filed

after that effective date.  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997)*; Woodford v. Garceau*,

538 U.S. 202, 210 (2003); *Barker v. Yukins*, 199 F.3d 867, 871 (6th Cir. 1999).  Because

Esparza's Petition was filed on July 12, 1996, several months after the AEDPA's effective date,

the AEDPA governs this Court's consideration of his Petition.

The AEDPA was enacted "to reduce delays in the execution of state and federal criminal

sentences, particularly in capital cases, and 'to further the principles of comity, finality, and

federalism.'"  *Woodford,* 538 U.S. at 206 (quoting *Williams v. Taylor*, 529 U.S. 362, 436

(2000)).  The requirements of the AEDPA "create an independent, high standard to be met

before a federal court may issue a writ of habeas corpus to set aside state-court rulings."  *Uttecht*

*v. Brown*, 551 U.S. 1, 127 S.Ct. 2218, 2224 (2007) (citations omitted).  As the Supreme Court

recently explained, the AEDPA's requirements reflect "the view that habeas corpus is a 'guard

against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary

-21-

error correction through appeal." *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011) (quoting

*Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)).

> Section 2254(d) provides:
>
> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the  facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  This is "a 'difficult to meet'. . . and 'highly deferential standard for

evaluating state-court rulings, which demands that state-court decisions be given the benefit of

the doubt.'"  *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (April 2011) (quoting *Harrington v.*

*Richter*, 131 S.Ct. 770, 786 (2011) and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per

curiam)).  The Petitioner carries the burden of proof.  *Pinholster*, 131 S.Ct. at 1398.

With respect to Section 2254(d)(1), "clearly established federal law" refers to the

holdings (as opposed to dicta) of the United States Supreme Court's decisions as of the time of

the relevant state court decision.  *Williams*, 529 U.S. at 412; *Barnes v. Elo*, 231 F.3d 1025, 1028

(6th Cir. 2000).  The "contrary to" and "unreasonable application" clauses of Section 2254(d)(1)

are independent  tests and must be analyzed separately.  *Williams*, 529 U.S. at 412-13; *Hill v.*

*Hofbauer*, 337 F.3d 706, 711 (6th Cir. 2003).  A state court decision is "contrary to" federal law

"only if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court

on a question of law or if the state court decides a case differently than [the Supreme] Court has

-22-

on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13.

Even if the state court identifies the "correct governing legal principle," a federal habeas court may still grant the petition if the state court makes an "unreasonable application" of "that principle to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 413.  A state court decision involves an unreasonable application if it unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.  *Id.* at 407; *Hill*, 337 F.3d at 711.  As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable– a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).  The reasonableness of the application of a particular legal principle depends in part on the specificity of the relevant rule.  *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).  While the application of specific rules may be plainly correct or incorrect, courts may have more leeway in reasonably applying more general rules in the context of a particular case.  *Id*.

The Supreme Court recently emphasized the limited nature of review under Section 2254(d)(1) in *Pinholster*, *supra* and *Harrington*, *supra*.  In *Pinholster*, the Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits" and that "evidence introduced in federal court has no bearing on § 2254(d)(1) review." *Pinholster*, 131 S.Ct. at 1398, 1400.  The Court further cautioned in *Harrington* that the AEDPA requires federal habeas courts to review state court decisions with "deference and latitude," and that "[a] state court's determination that a claim

lacks merit precludes habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id*. at 786 (quoting *Yarborough*, 541 U.S. at 664).

The Supreme Court interpreted the "unreasonable determination of the facts" clause in Section 2254(d)(2) in *Wiggins v. Smith*, 539 U.S. 510 (2003).  In that case, the Court noted that a "clear factual error" constitutes an "unreasonable determination of the facts in light of the evidence presented." *Id*. at 528-29.  In other words, a state court's determination of facts is unreasonable if its findings conflict with clear and convincing evidence to the contrary.  This analysis mirrors the "presumption of correctness" afforded factual determinations made by a state court, which can only be overcome by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Mitchell v. Mason*, 325 F.3d 732, 737-38 (6th Cir. 2003); *Clark v. O'Dea*, 257 F.3d 498, 506 (6th Cir. 2001).  This presumption only applies to basic, primary facts, and not to mixed questions of law and fact.  *See Mason*, 325 F.3d at 737-38 (holding ineffective assistance of counsel is mixed question of fact and law to which the unreasonable application prong of Section 2254(d)(1) applies).

By its express terms, however, Section 2254(d)'s constrained standard of review only applies to claims that were "adjudicated on the merits" in the state court proceeding. *Harrington*, 131 S.Ct. at 784.  *See also Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004). When a state court does not assess the merits of a petitioner's habeas claim, the deference due under the AEDPA does not apply.  In such a case, the habeas court is not limited to deciding whether that court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, but rather conducts a *de novo* review of the claim.  *See Morales v. Mitchell*, 507 F.3d 916, 930 (6th Cir. 2007); *Newton v. Million*, 349 F.3d 873, 878 (6th Cir.

-24-

2003); *Maples v. Stegall*, 340 F.3d 433, 436-37 (6ᵗʰ Cir. 2003).

      **B.**     **Application of the *Teague* doctrine**

      Citing *Teague v. Lane*, 489 U.S. 288 (1989), Respondent argues Esparza cannot "justify his claims or bolster his avenues of relief with contemporary legal developments" or "avail himself of any recent law" in arguing that this Court should re-adopt its previous Opinion granting habeas relief on his denial of continuance and IAC during mitigation claims.  (ECF # 170 at 3).  However, he maintains this Court may consider changes in the law that are unfavorable to Esparza under the *Teague* doctrine.  (ECF # 170 at 4).  Esparza does not address this issue in either of his recent cross-briefings.

      In *Teague* and subsequent cases, the Supreme Court explained the framework for determining when rules apply retroactively to final criminal judgments.  Under *Teague*, an "old rule" applies both on direct and collateral review, but a "new rule" is generally applicable only to cases that are still on direct review.  *See Teague*, 489 U.S. at 310-11; *Whorton v. Bockting*, 549 U.S. 406, 416 (2007); *Griffith v. Kentucky*, 479 U.S. 314 (1987).  A "new rule" applies retroactively in a collateral proceeding only if (1) the rule is substantive;[7] or (2) the rule is a "watershed rule of criminal procedure" implicating the fundamental fairness and accuracy of the criminal proceeding.[8]  *Whorton*, 549 U.S. at 416.  *See also Saffle v. Parks*, 494 U.S. 484, 488

---

[7]    A new "substantive" rule "includes decisions that narrow the scope of a criminal statute by interpreting its terms, as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish."  *Schriro*, 542 U.S. at 351-52.  Such rules apply retroactively because they "necessarily carry a significant risk that a defendant stands convicted of an act that the law does not make criminal or faces a punishment that the law cannot impose upon him." *Id*. at 352 (citations omitted).

[8]    In order to qualify as a "watershed"rule, the rule (1) must be necessary to prevent "an impermissibly large risk of an inaccurate conviction;" and (2) must "alter our understanding of the

(1990); *Schriro v. Summerlin*, 542 U.S. 348, 353 (2004); *Duncan v. United States*, 552 F.3d 442, 444 (6th Cir. 2009).  A case announces a "new rule" when "it breaks new ground or imposes a new obligation on the States or the Federal government." *Teague*, 489 U.S. at 301.  Further, the Supreme Court has explained that a "new rule" is defined as "a rule that. . . . was not dictated by precedent existing at the time the defendant's conviction became final." *Schriro*, 542 U.S. at 352. *See also Whorton*, 549 U.S. at 416.  Finally, a decision does not announce a "new rule" when it is "merely an application of the principle that governed" a prior Supreme Court case. *Teague*, 489 U.S. at 307.

In the instant case, Respondent does not specifically identify any "new rule" (either substantive or procedural) in the instant case that he claims is encompassed by the *Teague* doctrine.  Rather, he claims generally that Esparza cannot avail himself of "*any* recent law" in support of his argument that this Court should re-adopt its previous Opinion regarding his denial of continuance and IAC during mitigation claims.  (ECF #170 at 3).  Presumably, Respondent means  Esparza cannot rely on any Sixth Circuit or Supreme Court decisions decided after this Court's October 13, 2000 Opinion that relate to the legal standards this Court must consider in considering habeas relief on Esparza's IAC during mitigation or denial of continuance claims.

The Court  rejects  Respondent's argument.  In re-examining its October 13, 2000 Opinion & Order with regard to Esparza's remaining claims, this Court will not be required to apply any "new rules," either substantive or procedural.  Rather, this Court will review recent Sixth Circuit and Supreme Court case law regarding the legal standards for determining whether

---

bedrock procedural elements essential to the fairness of a proceeding." *See Whorton*, 549 U.S. at 418. This exception to the non-retroactivity of new rules of criminal procedure is "extremely narrow." *Id*. at 417.

(1) counsel provided ineffective assistance during the mitigation phase of Esparza's trial, and (2) the trial court abused its discretion in denying defense counsel's motion for a continuance.  In both instances, the underlying case law is "clearly established" and any recent cases applying it do not rest on a "new rule."  *See, e.g. Johnson v. Bagley*, 544 F.3d 592, 598 (6th Cir. 2008) (in habeas review of state court decision, Sixth Circuit applies recent Supreme Court case regarding ineffective assistance of counsel because it "did not rest on 'new law' but instead 'applied the same clearly established precedent of *Strickland*"); *Foust v. Houk*, 655 F.3d 524, 534 at fn3 (6th Cir. 2011) (same).

Accordingly, the Court rejects Respondent's argument that *Teague* bars this Court's consideration of any Sixth Circuit and/or Supreme Court cases relating to the legal standards on habeas review for considering Esparza's denial of continuance and IAC during mitigation claims.

### C.    Evidence that May Be Considered under *Pinholster*

Although not a "new rule" under *Teague*, the Supreme Court did recently issue an Opinion that will have a significant impact on the instant case.  In *Cullen v. Pinholster*, 131 S.Ct. 1388 (2011), the Supreme Court considered the issue of whether review under 28 U.S.C. § 2254(d)(1) permits consideration of evidence introduced in an evidentiary hearing before the federal habeas court.  In that case, Pinholster was convicted of two counts of first-degree murder.  *Id*. at 1395.  During the mitigation phase of his trial, the prosecution called eight witnesses, who testified about Pinholster's history of threatening and violent behavior.  *Id*. at 1396.  Defense counsel called only Pinholster's mother, who gave an account of Pinholster's troubled childhood and adolescence.  *Id*.  Defense counsel did not call a psychiatrist, although

they had consulted with one prior to trial who had diagnosed Pinholster with antisocial personality disorder.  *Id*.  A California jury unanimously sentenced Pinholster to death.  *Id*.

On  mandatory appeal, the California Supreme Court affirmed the judgment.  Pinholster then filed two related state habeas petitions, arguing his trial counsel were ineffective for failing to adequately investigate and present mitigating evidence.  *Id*.  Pinholster supported this claim with school, medical, and legal records, as well as declarations from family members, trial counsel and a psychiatrist who criticized the earlier diagnosis of antisocial personality disorder and instead diagnosed Pinholster with bipolar mood and seizure disorders.  *Id*.  The California Supreme Court summarily denied both habeas petitions, rejecting Pinholster's ineffective assistance claim "on the substantive ground that it is without merit."  *Id.*

Pinholster raised the same ineffective assistance of counsel claim in federal habeas proceedings.  The federal district court held an evidentiary hearing, during which Pinholster presented testimony from two new medical experts who diagnosed him with organic personality syndrome and suggested he suffered from partial epilepsy and a brain injury.  *Id*. at 1397.  On the basis of this new evidence, the district court granted habeas relief on the grounds Pinholster's defense counsel were ineffective for failing to investigate and present mitigation evidence at the penalty hearing.  *Id*.  Sitting *en banc*, the Ninth Circuit affirmed, holding the district court's evidentiary hearing was not barred by §2254(e)(2) and the new evidence from the hearing could be considered in assessing whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law" under § 2254(d)(1).  *Id*.

The Supreme Court  reversed, holding that "review under §2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  *Id*. at 1398.

Noting that "review under §2254(d)(1) focuses on what a state court knew and did," the
Supreme Court remarked "[i]t would be strange to ask federal courts to analyze whether a state
court's adjudication resulted in a decision that unreasonably applied federal law to facts not
before the state court." *Id*. at 1399.  "[H]olding that evidence introduced in federal court has no
bearing on § 2254(d)(1) review," the Supreme Court made clear that, "[i]f a claim has been
adjudicated on the merits by a state court, a federal habeas petitioner must overcome the
limitation of §2254(d)(1) on the record that was before the state court." *Id*. at 1400.

The Court explained this understanding of §2254(d)(1) is "compelled by 'the broader
context of the statute as a whole,' which demonstrates Congress' intent to channel prisoners'
claims first to state courts." *Id*. at 1398-99.  It further noted its reading of the statute did not
render §2254(e)(2) (which governs the circumstances under which federal courts may grant
evidentiary hearings) superfluous, but rather highlights how § 2254(d)(1) and (e)(2) work
together to ensure the AEDPA's overall intent that "federal courts sitting in habeas are not an
alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue
in state court proceedings." *Id*. at 1401.

Applying the above principles to Pinholster's case, the Supreme Court went on to find
that § 2254(d) applied to Pinholster's ineffective assistance claim because that claim was
adjudicated on the merits in state-court proceedings. *Id*. at 1402.  Accordingly, federal habeas
review of this claim should have been limited strictly to the state court record.  After conducting
its own "thorough review of the state court record," and applying the "doubly deferential"
standard of review under *Strickland* and § 2254(d)(1), the Supreme Court found Pinholster had
failed to demonstrate there was no reasonable basis for the state court's summary denial of his

-29-

ineffective assistance of counsel claim.  *Id*. at 1403.

Since the Supreme Court's holding in *Pinholster*, the Sixth Circuit has repeatedly acknowledged that federal habeas courts are now limited to considering "only 'the record that was before the state court that adjudicated that claim on the merits' when evaluating an AEDPA claim."  *Titlow v. Burt*, — F.3d ----, 2012 WL 1848714 at *5 (6th Cir. May 22, 2012) (quoting *Pinholster*, 131 S.Ct. at 1398).  *See also Bray v. Andrews*, 640 F.3d 731, 737 (6th Cir. 2011) (on review of conditional grant of § 2254 habeas petition, noting that "our review is, as the Supreme Court recently made clear, 'limited to the record that was before the state court'"); *Nali v. Phillips*, — F.3d ----, 2012 WL 2018206 at * 14 (6th Cir. June 6, 2012) (under *Pinholster*, district court's review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits); *Campbell v. Bradshaw*, 674 F.3d 578, 585-86 (6th Cir. 2012) (same); *Fears v. Bagley*, 2012 WL 516169 at *8 (6th Cir. Feb. 16, 2012) (same).

Indeed, on several recent occasions, the Sixth Circuit has refused to consider evidence obtained during federal habeas proceedings when considering claims under § 2254(d) that had been adjudicated on the merits by the state courts.  For example, in *Campbell v. Bradshaw*, 674 F.3d 578 (6th Cir. 2012), petitioner supported an ineffective assistance of counsel during the mitigation phase claim with an affidavit submitted by a psychologist, Dr. Bartollas, during post-conviction, as well as testimony by Dr. Bartollas during a federal evidentiary hearing.  Noting the state courts had adjudicated Campbell's claim on the merits, the Sixth Circuit found it was "limited to the record that was before the state court" and would therefore  "only consider [Dr.] Bartollas' affidavit, which was before the state court on post-conviction" and would not consider Dr. Bartollas testimony at the federal hearing.  *Id*. at 591, fn 3.  The court further noted "[w]e

-30-

similarly cannot review the testimony that defense counsel William Mooney gave at the federal evidentiary hearing because it was not part of the state court record." *Id.  See also Fears v. Bagley*, 2012 WL 516169 at * 8 (6th Cir. Feb. 16, 2012) (refusing to consider testimony and evidence from federal evidentiary hearing because "*Pinholster* is clear that, when evaluating whether the state courts on collateral review applied *Strickland* in an objectively unreasonable manner, we may consider only the evidence that was before that court at that time"); *Strouth v. Colson*, — F.3d—, 2012 WL 1861716 at *5 (6th Cir. May 23, 2012) (where petitioner sought to supplement the federal habeas record with new mental health evaluation, court found that "[t]he new mental-health evidence has no bearing on whether AEDPA permits us to grant him habeas relief" because it was not part of the record that was before the state court).[9]

Moreover, several district courts within the Sixth Circuit have had occasion to apply *Pinholster* in circumstances similar to the instant case.  For example, in *Gillespie v. Timmerman-Cooper*, 2011 WL 2224487 (S.D.Ohio June 8, 2011), an evidentiary hearing was conducted in federal habeas proceedings on Petitioner's *Brady* claims, during which new

---

[9]    Additionally, several other Circuit Courts of Appeals have strictly applied *Pinholster* and refused to consider new evidence obtained in federal habeas proceedings when considering a claim under § 2254(d)(1) that had been adjudicated on the merits in state court.  *See e.g. Jackson v. Kelly*, 2011 WL 1534571 (4th Cir. April 25, 2011) (finding that, in light of *Pinholster*, "[i]t is now clear . . . that the [district] court's reliance on material developed at the federal evidentiary hearing was at odds with AEDPA's placement of 'primary responsibility for [habeas review] with the state courts"); *Pape v. Thaler*, 645 F.3d 281 (5th Cir. 2011) (finding that "[u]nder *Pinholster*. .. the district court erred by conducting the evidentiary hearing and by relying on evidence from that hearing to conclude that the state habeas court had unreasonably applied *Strickland*); *Champ v. Zavaras*, 2011 WL 2411002 (10th Cir. June 16, 2011) (finding petitioner's requests to expand the record and hold an evidentiary hearing to further develop the record "aim to place new evidence before the federal court that was not a part of the state court record" and that, under *Pinholster*, "this is no longer permitted").

evidence was obtained that had not been presented to the state courts.  After *Pinholste*r was decided, the Warden moved the district court to rule that all evidence taken during the federal evidentiary hearing could not be considered.  The district court determined that, because the state courts had adjudicated Petitioner's *Brady* claims on the merits, *Pinholster* "precludes this Court from considering, in deciding the §2254(d)(1) question, evidence introduced at the evidentiary hearing conducted in this Court . . . before [*Pinholster*] was decided." *Id*. at * 1. Quoting *Pinholster*, the district court explained "that means that any evidence which this Court took at the evidentiary hearing or that is offered in Petitioner's Motion to Expand the Record is immaterial to a decision on whether the Ohio courts' decision on Gillespie's *Brady* claim was contrary to or an unreasonable application of United States Supreme Court precedent on ineffective assistance of counsel." *Id*.  *See also Issa v. Bradshaw*, 2011 WL 2293128 (S.D. Ohio June 9, 2011) (finding testimony taken in federal evidentiary hearing prior to *Pinholster* regarding petitioner's IAC claim could no longer be considered because *Pinholster* "requires this Court to ignore that evidence in deciding the question posed by . . § 2254(d)(1)"); *Hale v. Davis*, 2011 WL 3163375 (E.D. Mich. July 27, 2011) (same).

    In the instant case, the Court's October 13, 2000 Opinion & Order  reviewed Esparza's IAC during mitigation and denial of continuance claims under § 2254(d)(1) and expressly found that the state courts had adjudicated these claims on the merits.  With regard to Esparza's IAC during mitigation claim (Claim 44), the Court explained:

> Respondent does not assert that this claim is either unexhausted or subject
> to procedural default.  Indeed, respondent quotes from the Ohio appellate
> court decision where the claims presented here were squarely addressed
> on the merits.  On direct appeal, the state courts found that Esparza had
> not been denied effective assistance of counsel at either stage of the
> proceedings.  See *State v. Esparza*, No. L-84-225, 1986 WL 9101 at * 22

(Ohio App. Aug. 22, 1986); *State v. Esparza*, 529 N.E.2d 192, 198 (Ohio 1988). During post-conviction proceedings, moreover, the state courts again rejected this claim on the merits, concluding that it was proper to decide the issue without an evidentiary hearing because they believed the claim could be determined by reference to the trial court record. *State v. Esparza*, 1992 WL 113827 at * 6 (Ohio App. May 29, 1992) ("Upon a thorough and careful review of the penalty proceedings in petitioner's capital trial, we conclude that the trial counsel's failure to interview or call all potential witnesses did not amount to ineffective assistance of counsel. Moreover, because the issue of ineffective assistance of counsel during the penalty phase of a capital trial can be determined upon a review of the record, the trial court did not err in dismissing the fiftieth cause of action without a hearing"). This Court will accordingly, proceed to address the issue on the merits.

(ECF #132 at 120). Similarly, with regard to Esparza's denial of continuance claim (Claim 39), the Court noted "[t]his claim was raised on direct appeal, and respondent does not allege that it has been procedurally defaulted. Therefore, this Court will address this claim on the merits." (ECF #132 at 147).

In light of the above, the Court finds that both Esparza's denial of continuance and IAC during mitigation claims (Claims 39 and 44) were adjudicated on the merits by the state courts and are, therefore, governed by § 2254(d)(1). As such, the Court finds *Pinholster* applies to the instant case. Under that decision, this Court is now precluded from considering any of the evidence or testimony adduced during discovery and/or the evidentiary hearing conducted in this federal habeas proceeding. Because the Court's October 13, 2000 Opinion & Order clearly relied heavily on such evidence, the Court finds its rulings in that Opinion regarding Esparza's IAC during mitigation and denial of continuance claims must be vacated. Moreover, with respect to Esparza's cumulative error during the sentencing phase claim (Claim 52), the Court's previous ruling on this claim was predicated on its findings with respect to Esparza's denial of continuance and IAC during mitigation claims. Because the Court's previous rulings as to these

-33-

claims must be vacated, the Court's prior decision granting Esparza's cumulative error claim must also necessarily be vacated.

The Court proceeds, therefore, to conduct an analysis of these claims under § 2254(d)(1), considering only that evidence that was before the state courts.

## V.     Analysis of Esparza's Denial of Continuance, IAC during Mitigation, and Cumulative Error during the Sentencing Phase Claims Based Solely on the State Court Record

Prior to analyzing the legal bases for Esparza's denial of continuance, IAC during mitigation, and cumulative error claims, this Court will first set forth the facts relevant to these particular claims.

### A.     Relevant Facts from the State Trial Court Proceedings

As set forth *supra*,  Esparza was indicted in October 1983 on one count of aggravated murder and one count of aggravated robbery in connection with the death of Melanie Gerschultz.  At Esparza's specific request, the trial court (Lucas County Court of Common Pleas Judge Reno Riley) appointed attorneys Tom Stebbins and Norm Zemmelman to represent him. (ECF # 20 at 10/20/83 Pretrial Conf. at 3; ECF # 43 at Exh. TT, p.1).  During a subsequent pretrial on October 28, 1983, the court set a trial date of January 23, 1984.  (ECF # 21 at 10/28/82 Pretrial Conf. at 3).

One week before trial, Esparza filed a Motion for Continuance and to Vacate the Trial Date, arguing his private investigator needed additional time to conduct witness interviews. (ECF # 43 at Exh. TT, p. 2; ECF # 21 at 1/17/84 Motion Hrg. at 1-3).  The trial court granted Esparza's motion and set a new trial date of March 5, 1984.  (ECF # 21 at 1/17/84 Motion Hrg. at 7).

-34-

On March 2, 1984, three days before trial was to begin, Mr. Zemmelman advised the court that he had just become aware of a conflict of interest that necessitated his withdrawal from the case.  (ECF # 21 at 3/2/84 Pretrial Hrg.).  After some discussion and argument, the trial court granted Zemmelman's request to withdraw and vacated the trial date.  (ECF # 21 at 3/2/84 Pretrial Hrg.).  A pretrial was subsequently held on March 8, 1984, during which Judge Riley expressed concern regarding Esparza's speedy trial rights in light of the repeated delays in bringing the case to trial.  Judge Riley explained he had set a new trial date of April 30, 1984 and had contacted two experienced criminal defense attorneys (Mr. Konop and Keith Sparrow) regarding their availability to replace Mr. Zemmelman with that trial date in mind.  Mr. Sparrow was available to take the case, while Mr. Konop was unavailable due to a scheduling conflict.  (ECF # 21 at 3/8/84 Pretrial Hrg. at 5-6).

Judge Riley appointed Keithly Sparrow as Esparza's lead counsel.  It appears Esparza's remaining attorney, Tom Stebbins, had hoped Konop would be appointed instead of Sparrow.  Acknowledging this, Judge Riley nevertheless "earnestly request[ed]" that Stebbins stay on the case as co-counsel with Sparrow citing Stebbins' "close relationship" with Esparza and his familiarity with the case.  Stebbins refused, however, stating  "I do not feel that the two of us [Sparrow and himself] have enough experience to handle this case."  (ECF # 21 at 3/8/84 Pretrial Hrg. at 21).  The trial court reluctantly allowed Stebbins to withdraw and appointed Ralph De Nune III to serve as Esparza's co-counsel.  (ECF # 21 at 3/8/84 Pretrial Hrg. at 16; ECF # 43 at Exh. TT, p. 4).

Jury selection commenced on April 30, 1984 with Keithly Sparrow and Ralph De Nune as Esparza's defense team.  Opening arguments and trial testimony began on May 4, 1984.  On

that date, Esparza filed a "Motion for Independent Expert at State Expense."[10]  (ECF # 43 at

Exh. TT-32).  In that Motion, Esparza asked the court to issue an order appointing clinical

psychologist Dr. Charles Layne to conduct an "independent mental examination" of Esparza

pursuant to Ohio Rev. Code §§ 2929.024 and 2929.03.  The motion further states that "if

defendant is convicted of the offense charged . . . , defendant will request, pursuant to Section

2929.03(D)(1), Ohio Revised Code, a mental examination and contends that such examination

must be made by an independent psychologist."  (ECF # 43 at Exh. TT-32).

    The jury returned a guilty verdict on Thursday, May 10, 1984 and the trial court

thereafter heard argument regarding Esparza's Motion.  (Tr. Vol. III at 1693- 1702).  During

argument, defense counsel requested the court order a pre-sentence investigation ("PSI") and

mental examination of Esparza pursuant to O.R.C. § 2929.03.  In addition, counsel specifically

asked the court to appoint Dr. Layne to conduct the mental examination, stating they intended

for him to work with a social worker employed through the Ohio Public Defender's Office.  The

State argued the Court Diagnostic & Treatment Center ("CDTC")[11] was qualified to conduct the

exam and "routinely handled" these types of requests.  The trial court agreed with the State and

ordered CDTC to conduct the exam, noting that § 2929.03 specifically provided the court with

discretion to choose who will conduct the mental examination.  The court also explained that,

---

[10]    This Motion constitutes Esparza's first request (from any of his defense attorneys) for
funding for expert services from a psychologist and/or psychiatrist.

[11]    According to its website, the CDTC is a "private, not-for-profit organization providing
forensic evaluation services to the courts in Lucas County and 12 surrounding counties in Northwest
Ohio and serving the mental health treatment needs of persons referred by these courts or their
divisions."  It "employs a clinical staff composed of master's level counselors, social workers,
psychiatrists, and psychologists who help provide expert forensic evaluation and mental health
services."  *See* http://www.courtdiagnostic.com.

-36-

pursuant to § 2929.03, copies of the PSI and mental examination reports would be provided, not only to the defense, but to the court, the prosecution, and the jury. (Tr. Vol. III at 1702).

The court referred the matter to the Lucas County Probation Department for a PSI and to the CDTC for a mental examination. These reports were completed the following day and provided to the parties on Saturday, May 12, 1984. (ECF # 20 at 5/12/84 Motion Hearing at 31). While the court had hoped to commence the mitigation phase of the proceedings on Monday, May 14th, it granted defense counsel's request to delay until Tuesday, May 15, 1984. (ECF # 20 at 5/12/84 Motion Hearing at 33).

After reviewing the contents of the PSI and mental exam, Esparza immediately filed a four-pronged Motion to (1) withdraw his request for the PSI and mental examination reports; (2) exclude the reports from the jury's consideration; (3) renew his request for an independent expert; and (4) request a continuance of the mitigation phase of the proceedings. (ECF # 43 at Exh. TT-38). In this Motion, Esparza first raised a number of complaints about the substance of the PSI and mental examination reports. He stated that both reports "went beyond the scope of the investigation and examination which are now contemplated under Section 2929.03(D)(1), and in fact went to the issues, which are solely those to be determined by the jury, of whether or not there are certain mitigating factors which would outweigh the aggravating circumstance which has already been proven." (ECF # 43 at Exh. TT-38 at 2). Esparza further contended the Probation Department and CDTC (1) "did not have the opportunity nor did they take the time to interview those relevant persons who would have first-hand knowledge of the defendant and defendant's life;" (2) were not advised of their proper role in preparing the reports and "took it upon themselves to determine that they were to investigate and provide conclusions" as to each

-37-

of the mitigating factors set forth in § 2929.04(B); and (3) effectively turned potential mitigating circumstances into aggravating circumstances, to the severe prejudice of the defendant.

Based on the above, Esparza argued that "it is impossible for defendant to meet the burden he has with the existing reports, the time frame in which they were prepared, and the apparent misunderstanding on the part of the preparers as to the purpose of the reports."  (ECF # 43 at Exh.TT-38 at 3).  He asked the Court allow him to withdraw his request for the PSI and mental examination reports and exclude these reports from the jury's consideration.  In addition, he renewed his motion to have an independent psychologist appointed to prepare an appropriate social history and mental examination report.  While Esparza acknowledged this would be "an inconvenience to the jurors who have had to be sequestered since their verdict," he maintained that to proceed with the mitigation proceedings "without adequate opportunity to prepare would make counsel ineffective in its representation of defendant and would be a denial of the effective assistance of counsel rights and due process rights which defendant has under both the Ohio the United States Constitutions."  (ECF # 43 at Exh.TT-38 at 3).

The court heard oral arguments regarding Esparza's motion on Tuesday, May 15, 1984 and denied the motion in all respects.  The court explained:

> THE COURT:  Once the request for the pre-sentence investigation was made, the Court was required under the statute [i.e. 2929.03(D)] to provide it. The practice of this Court has always been, and I don't know who else we would use, in any event, except to use the Probation Department of this Court, a highly qualified group of social workers and social scientists with fine credentials educationally and those developed by experience.
>
> Once the referral is made, it is made, and it cannot be made excepting by request of the Defendant, and it must be made when it is requested by the Defendant. To now indicate that because it doesn't contain those matters which the Defendant hoped it would contain or perhaps be as favorable as

-38-

the Defendant hoped it might be, that now that might be withdrawn strikes me as just completely flouting the intention of the statute and the purpose of allowing the option to the Defendant.

* * *

The same is true of the mental examination. The statute is clear that if the mental examination is requested, that the Court must provide it, and the Court must see to it being done. It does not require the Court to provide to the Defendant the mental examination of any particular person or that we import from one of the great hospitals of this country or Switzerland or Germany or whatever.  We must have the mental examination. The mental examination here is of the type that the Court is familiar with and is of the type that is generally provided in criminal cases.  Again, to give to the Defendant, once he has made the request, the power of veto seems to me to ask the Court to indulge in a great unfairness, and again, to act in opposition to the clear mandates of the statutory law.

* * *

To grant a continuance at this time, the Court has heard no– heard or seen no particular reason to do that. We have had the matter scheduled for a considerable amount of time. We, as a matter of fact, delayed it from the desired time. We thought we might even be able to start the matter on Saturday. We delayed it until Monday, and then we have delayed it from Monday until today at the request of counsel. We feel there has been adequate time provided.  All of the preparations of the Court for the proceeding . . . have been made, and we are at this point we feel obliged to go forward in view of that which we have heard.

Therefore, as to all four of its particulars, the combined motion of the defense is denied.

(Tr. Mitigation Hrg. at 15-18).  The mitigation phase of the proceeding started immediately

thereafter.

During the mitigation hearing, Esparza called the following family members to describe

his childhood and upbringing: (1) Richard DeLa Rosa (maternal grandfather); (2) Virginia

Gonzales (maternal aunt); (3) Peter Esparza (older brother); and (4) Ralph Grennay (foster

father).  Defense counsel also introduced into evidence Esparza's juvenile "Family File," which

contained documents detailing his extensive juvenile record as well as several previous psychological examinations. This "Family File" was introduced into evidence as "Joint Exhibit A," and provided to the jury during deliberations.[12]

Through these witnesses and Joint Exhibit A, Esparza introduced the following evidence. Esparza was the third of eight children born to Frank and Beatrice Esparza. (ECF # 193-1 at 4, 15, 22).[13] Frank Esparza was an alcoholic and abusive to both his wife and his children, including Petitioner. (Tr. Mit. Hrg. at 51-52, 60; ECF # 193 at 4-5, 22). He had an extensive criminal record and provided no consistent source of income or support for his family. (ECF # 193-1 at 15-16; ECF # 185-1 at 34; ECF # 185-1 at 39). As a result, the Esparza children often went without food or appropriate clothing. (Tr. Mit. Hrg. at 34-37, 48-49, 59; ECF # 186-1 at 38). Beatrice Esparza was only sixteen when she got married, and quickly became overwhelmed by her growing family and lack of financial support. (ECF # 193-1 at 22; ECF # 186-1 at 37-38). She began neglecting the children and leaving them unsupervised. (Tr. Mit. Hrg. at 37-38).

When Esparza was 5 or 6 years old, he and his siblings were removed from the home by the State and placed in a Children's Home. (Tr. Mit. Hrg. at 39, 61; ECF # 193-1 at 15-16, 22).

---

[12]   Defense counsel expressly referred to the Family File during closing arguments and encouraged the jury to "[r]ead what is in his family file. Read about Greg Esparza. You heard about him. There is a lot of information for you." (Tr. Mit. Hrg. at 181).

[13]   On December 2, 2011, this Court ordered the parties to produce full, complete, and legible copies of the Mitigation Hearing Transcript, Joint Exhibit A to the Mitigation Hearing, and all filings relating to Esparza's Initial Post-Conviction Petition filed November 29, 1989. (ECF # 182). On February 17, 2012, Respondent submitted copies of the documents requested by this Court. These documents were docketed as ECF # 185, 186, 187, 188, 189, 190, 191, 192, and 193. For ease of reference, this Opinion will refer to these docket numbers in referencing specific pages from Joint Exhibit A and Esparza's Initial Post-Conviction Petition.

-40-

Beatrice Esparza subsequently died of cancer when Esparza was approximately 7 or 8 years old. (Tr. Mit. Hrg. at 34; ECF # 193-1 at 16, 22).  Eventually, all of the Esparza children were placed with relatives, except Petitioner who was bounced around among foster homes and state facilities.  (Tr. Mit. Hrg. at 40-43, 61; ECF # 193-1 at 8, 17, 22).  Esparza was placed with his maternal grandparents for a short time, but was ultimately removed from his grandparents' home when it became apparent his grandparents could not control him.  (ECF # 193-1 at 4, 17).

In July 1975, when he was 12 years old, Esparza was placed with foster parents Ralph and Marietta Grennay.  (Tr. Mit. Hrg. at 74).  Mr. Grennay testified during mitigation that Esparza made significant improvements in both his grades and behavior during his stay with the Grennays.  (Tr. Mit. Hrg. at 85-86).  He testified Esparza "became part of the family" and joined the Boy Scouts and the football team.  (Tr. Mit. Hrg. at 77-78; ECF # 193-1 at 46).  He explained that Esparza's grades improved and there were no "major disciplinary problems" while Esparza lived with them.  (Tr. Mit. Hrg. at 86, 89; ECF # 193-1 at 46).  However, at some point in late 1976, Esparza began to visit his family in Toledo and expressed a desire to live with his grandparents.  (Tr. Mit. Hrg. at 81-82; ECF # 193-1 at 46, 53-54).  Mr. Grennay testified he was opposed to this idea and was concerned Esparza would backslide if he was returned to his family.  (Tr. Mit. Hrg. at 81-82; ECF # 193-1 at 46).

In January 1977, however, Esparza was removed from the Grennay's home and went to live with his maternal grandparents.  (ECF # 193-1 at 44, 53-54).  Almost immediately, Esparza exhibited difficulty adjusting to his grandparents' home and started "acting out."  (ECF # 193-1 at 53-54).  He was thereafter removed from his grandparents' custody and detained at the Child Study Institute.  (ECF # 193-1 at 54).  Efforts were made to locate a stable, structured

-41-

environment for Esparza, and his probation counselor, in fact, succeeded in securing a spot for

him at Boys' Town in Nebraska.  (ECF # 186-1 at 26-29).  However, before he could be

transferred there, Esparza was adjudicated delinquent on charges of theft, breaking and entering,

and grand theft auto, and Boys Town was no longer an option.  (ECF # 193-1 at 40).  Esparza

was thereafter committed to the custody of the Ohio Youth Commission and subsequently

transferred among numerous state facilities.  (ECF # 193-1 at 60, 63).  Esparza's Family File

contains documentation indicating he was charged with numerous offenses between 1977 and

his indictment for the aggravated murder of Melanie Gershultz, including resisting arrest,

receiving stolen property, breaking and entering, grand theft auto, carrying a concealed weapon,

aggravated menacing, coercion, disorderly conduct, attempted robbery, and domestic violence.

(ECF #3 193-1 at 1-3, 40, 67; ECF #186-1 at 49-52).

Defense counsel then called Dr. William Seman, a clinical psychologist at the CDTC, to

testify regarding his role in conducting Esparza's mental examination.  Dr. Seman first testified

the CDTC had only been involved in three of these types of mental examinations in the capital

context, and that Esparza's case was only the second time he himself had undertaken this type of

review.  (Tr. Mit. Hrg. at 99-100).  He further testified the "urgency of the referral" from the trial

court caused them to "deviate from their normal procedure" in conducting Esparza's

examination.  (Tr. Mit. Hrg. at 101).  Specifically, Dr. Seman stated they normally would have

consulted a social worker to prepare a detailed social history before conducting a mental

examination, but that they did not have the time to consult a social worker in Esparza's case.

(Tr. Mit. Hrg. at 101).  Instead, another psychologist from the CDTC, Dr. Charlene Cassell,

administered psychological testing of Esparza, and Drs. Seman and Cassell conducted a joint

interview of Esparza the following day.  (Tr. Mit. Hrg. at 101-2).

Dr. Seman emphasized that, on the morning of that joint interview, he and Dr. Cassell undertook an extensive review of the "social history in this case," including documents regarding Esparza's childhood, adolescence, juvenile and adult criminal records, and previous psychological examinations.  (Tr. Mit. Hrg. at 104).  He further stated he and Dr. Cassell conducted a "social workup" in the sense that they "reviewed the social history in a manner which was consistent with what would have been done by a social worker if a social worker had done it."  (Tr. Mit. Hrg. at 105-106).  Dr. Seman acknowledged, however, that they did not engage in any discussions with members of Esparza's family or foster family, and did not have records from many of the state juvenile institutions at which Esparza had been committed.  (Tr. Mit. Hrg. at 106-7).

Dr. Seman then testified regarding his conclusions regarding possible mitigating factors in Esparza's case.  He stated that, given that Esparza was only 21 years of age at the time of the offense, "certainly his youth might be a [mitigating] factor" that could be considered.  (Tr. Mit. Hrg. at 109).  Dr. Seman further testified  Esparza's dysfunctional and chaotic childhood was also relevant to mitigation, particularly evidence regarding his alcoholic and abusive father; his removal from the family home at age 6; the death of his mother at age 8; and his numerous unsuccessful foster home and institutional placements.  (Tr. Mit. Hrg. at 109-111).  Dr. Seman explained these factors regarding Esparza's childhood led him to diagnose Esparza as an anti-social personality disorder, which he described as:

> characterized by difficulties in close and warm relationships with others. We
> talk about a seeming inability at times to learn from experience. Legal
> entanglements are not uncommon. There is resentment of authority and
> tendencies to rebel against authority. Alcohol and substance abuse are not

> uncommon. Sexual promiscuity is sometimes in evidence. You know, but
> generally, the antisocial personality disorder is one that, you know, is
> associated with a criminal type of behavior.

(Tr. Mit. Hrg. at 112).  Dr. Seman testified that anti-social personality disorder is not a form of

psychosis and that he did not find any evidence indicating that Esparza was mentally ill.  (Tr.

Mit. Hrg. at 118-19).  The defense then rested its mitigation case, deciding against having

Esparza give an unsworn statement to the jury.

The State then called its only mitigation witness, CDTC psychologist Dr. Charlene

Cassell.  Dr. Cassell testified she administered a battery of psychological tests on Esparza to,

among other things, determine his IQ and screen for evidence of organic brain damage.  Her

testing indicated Esparza's IQ was 78, which is in the "borderline range" between normal and

mental retardation.  (Tr. Mit. Hrg. at 154).  Based on this result, she testified Esparza was not

mentally retarded and further that he had the ability to confine his behavior to the requirements

of the law.  (Tr. Mit. Hrg. at 154-155).

Dr. Cassell also testified she did not believe Esparza suffered from any mental illness,

but that he did meet the diagnostic criteria  for anti-social personality disorder.  (Tr. Mit. Hrg. at

156).  These criteria, she explained, included juvenile delinquency, difficulty with interpersonal

relationships, drug/alcohol abuse, difficulty sustaining employment, and "involvement with the

law."  (Tr. Mit. Hrg. at 156-57).  She testified that, in Esparza's case, there seemed to be an

"escalation  in terms of assaultive behavior" and the likelihood of him committing future similar

criminal acts was "fairly high."  (Tr. Mit. Hrg. at 160-163).  Dr. Cassell further testified that

"most people say" there is no treatment for anti-social personality disorder in adults.  (Tr. Mit.

Hrg. at 164).

-44-

Finally, on cross-examination, Dr. Cassell indicated that, while a social worker is normally involved to obtain records and speak with relevant family members in these types of review, CDTC did not use a social worker in conducting Esparza's mental examination.  (Tr. Mit. Hrg. at 168-69).  She further testified she did not have access to any psychological testing that may have been conducted by any of the juvenile institutions where Esparza had been committed over the years.  (Tr. Mit. Hrg. at 169).  She did state, however, the amount of time she spent on Esparza's examination was consistent with the amount of time she would have normally spent on a death penalty evaluation.  (Tr. Mit. Hrg. at 169).

The parties gave their closing arguments, and copies of both Esparza's Family File (Joint Exhibit A) and the PSI and mental examination reports were then given to the jury for use in deliberations.  The PSI sets forth Esparza's prior criminal record, listing all of his previous adult charges including aggravated menacing, coercion, grand theft, disorderly conduct, domestic violence, petty theft, attempted robbery, and assault.  (PSI at 2-3).  It includes a discussion of Esparza's reported history of alcohol and substance abuse, noting that Esparza indicated he had been abusing alcohol since age 15 and had used dilaudid, heroin and marijuana.  It states he is "average to above average intelligence" and possesses "no history of any psychiatric/ psychological treatment."  (PSI at 4).

The PSI then includes a section entitled "Mitigating Circumstances," which separately lists each of the seven mitigating factors set forth in R.C. § 2929.04(B).[14]  The report provides

---

[14]    These mitigating factors include: (1) the victim of the offense induced or facilitated it; (2) the offender was under duress, coercion, or strong provocation at the time of the offense; (3) at the time of committing the offense, the offender, because of mental disease or defect, lacked substantial capacity to appreciate the criminality of his act or to conform his conduct to the requirements of law; (4) the youth of the offender; (5) the defendant's lack of a significant history of prior criminal

an evaluation of the evidence for and against each mitigating factor, including those which were not raised or argued by Esparza during the mitigation hearing.  (PSI at 4-5).  For example, with respect to the mitigating factor described as "The defendant's lack of a significant history of prior criminal convictions," the PSI includes a discussion of Esparza's criminal history and notes that "[t]his officer would also note in viewing the defendant's prior criminal arrest record that it has escalated rapidly both in frequency and assaultiveness."  (PSI at 5).  The report further states that "the officer would describe the defendant as at least a moderate physical threat to the community."  (PSI at 5).  With respect to the "catch-all" mitigating factor in § 2929.04(B)(7), the report concludes "Esparza has had the opportunity to improve his lifestyle via probation services and did not take advantage of this opportunity."  (PSI at 5).  It also notes past incarceration has had "no deterrent effect upon his criminal activity" and that, if Esparza were "incarcerated for the maximum consecutive time and given no chance of parole, he would be approximately 61 years of age when released."  (PSI at 5).  The PSI attaches a previous PSI of Esparza conducted in connection with a 1982 coercion charge and a probation violation report relating to a 1983 attempted robbery charge.

The CDTC's mental examination includes a discussion of Esparza's chaotic childhood, as well as his prior juvenile and adult criminal record and history of alcohol/substance abuse.  It then sets forth the test results and analyses, as described in Dr. Seman's and Dr. Cassell's mitigation testimony.  Like the PSI, it concludes with a discussion of each of the mitigating

--------------------

convictions and delinquency adjudications; (6) the offender was a participant but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim; and (7) any other factors that are relevant to the issue of whether the offender should be sentenced to death. Ohio Rev. Code § 2929.024(B).

factors set forth in § 2929.04(B), including those not raised by Esparza during the mitigation

hearing:

> In terms of the questions raised by the present evaluation, the writer offers the
> following opinions.  Mr. Esparza is not presently mentally ill, but rather it is
> this writer's diagnostic impression that Mr. Esparza is suffering from an anti-
> social personality disorder.  There is no evidence that he has ever been
> mentally ill or that he is presently mentally ill.  His intellectual functioning is
> in the Borderline range but this is not a level deficient enough to impair his
> ability to appreciate the criminality of his conduct or to conform his conduct
> to the requirements of the law.  Mr. Esparza adamantly denies that he has
> committed the crime for which he has been convicted.  There is no evidence
> to indicate that at the time the offense occurred, he was under any significant
> duress, coercion, or strong provocation.
>
> * * *
>
> This man is 21 years of age and he may thus be considered to be a youthful
> offender.  Mr. Esparza's prior record indicates frequent contacts with the
> court beginning at the age of 11.  Since that time he has incurred various
> charges and has been incarcerated in the juvenile justice system and in the
> Lucas County Correctional Center and the Toledo House of Corrections.
> Therefore, it would appear that Mr. Esparza has a significant history of prior
> criminal convictions and delinquency adjudications.  From information
> available, it appears that only one person was involved in the present offense.
> Therefore, this writer can come to only one conclusion that being that Mr.
> Esparza was the principal offender.

(CDTC Mental Exam. at 4-5).  With regard to the catch-all mitigation factor set forth in §

2929.04(B)(7), the report discusses Esparza's childhood and foster placements.  It also notes

Esparza "has never developed a work history and apparently has few skills in terms of obtaining

employment."  (CDTC Mental Exam. at 5).  The report concludes by noting Esparza "was

apparently exposed to some treatment as a juvenile but this apparently had little effect and

consistently throughout the records are instances of rebellion against authority and an apparent

escalation of aggressive acting out."  (CDTC Mental Exam. at 5).

At the conclusion of closing arguments, the trial court instructed the jury that the State

had the burden of proving the aggravating factors outweighed the mitigating factors.  The court

noted there was one aggravating factor in the case; i.e. the aggravated murder of Melanie

Gerschultz during the commission of an aggravated robbery.  With respect to mitigating factors,

the court instructed the jury that mitigating factors "include, but are not limited to, the nature

and circumstances of the offense, the history, character and background of the offender, and any

or all of the following factors:" (1) the youth of the offender; (2) whether, at the time of the

offense, the offender because of a mental defect lacked substantial capacity to conform his

conduct to the requirement of law; and (3) "any other factors that are relevant to the issue of

whether the offender should be sentenced to death."  (Tr. Mit. Hrg. at 212-13).

On May 16, 1984, the jury commenced deliberations and returned a verdict

recommending imposition of the death penalty.  The trial court accepted the jury's

recommendation and imposed the death penalty on May 22, 1984.

**B.    State Court Procedural History**

In his direct appeal to the Ohio Supreme Court,[15] Esparza argued that (1) the mandatory

submission to the jury of the PSI and mental exam denied him effective assistance of counsel;

(2) the trial court erred in denying his request under § 2929.024 for an independent psychologist

to perform the mental examination; (3) the trial court erred in denying his request for a

---

[15]    At the time of his conviction, Esparza was first required to directly appeal to the Ohio court
of appeals.  In that appeal, Esparza argued that (1) he was denied effective assistance of counsel
when the mental examination report was submitted to the jury; (2) the mandatory submission of the
mental examination denied him his constitutional rights to due process and equal protection; (3) the
court erred in denying his request for the appointment of an independent psychologist; and (4) the
court erred in denying his request for a continuance. *See State v. Esparza*, 1986 WL 9101 at *10
(Ohio App. 6 Dist. Aug. 22, 1986).  The state appellate court rejected each of these arguments. *Id*.
at ** 10-15.  He then appealed to the Ohio Supreme Court, discussed above.

-48-

continuance; and (4) counsel were ineffective in submitting Esparza's Family File to the jury during mitigation. *See State v. Esparza*, 39 Ohio St.3d 8, 9 (1988). The Ohio Supreme Court rejected each of these claims.

First, the court noted that Ohio Revised Code §§ 2929.024 and 2929.03(D) are "wholly independent provisions." Section 2929.024 provides, in pertinent part:

> If the court determines that the defendant is indigent and that investigation services, experts, or other services are reasonably necessary for the proper representation of a defendant charged with aggravated murder at trial or at the sentencing hearing, the court shall authorize the defendant's counsel to obtain the necessary services for the defendant, and shall order that payment of the fees and expenses for the necessary services be made in the same manner that payment for appointed counsel is made pursuant to Chapter 120 of the Revised Code.

Ohio Rev. Code § 2929.024. The court explained that "[t]he services provided for by this statute are available to the indigent defendant solely for his own purposes in mounting a defense in a capital trial." *Esparza*, 39 Ohio St.3d at 10. It assures an indigent capital defendant access to a competent expert "but does not guarantee such defendant the right to handpick an expert at the state's expense." *Id*.

Section 2929.03, on the other hand, "applies to all capital defendants, whether indigent or not." *Id*. That statute provides, in relevant part:

> When death may be imposed as a penalty, the court, upon the request of the defendant, shall require a pre-sentence investigation to be made and, upon the request of the defendant, shall require a mental examination to be made, and shall require reports of the investigation and of any mental examination submitted to the court. * * * A pre-sentence investigation or mental examination shall not be made except upon request of the defendant. Copies of any reports prepared under this division shall be furnished to the court, to the trial jury if the offender was tried by a jury, to the prosecutor, and to the offender or the offender's counsel for use under this division. The court, and the trial jury if the offender was tried by a jury, shall consider any report prepared pursuant to this division and furnished to it and any evidence raised

> at trial that is relevant to the aggravating circumstances the offender was
> found guilty of committing or to any factors in mitigation of the imposition of
> the death sentence . . . . The defendant shall be given great latitude in the
> presentation of evidence of the mitigating factors set forth in division (B) of
> section 2929.04 of the Revised Code and of any other factors in mitigation of
> the imposition of the sentence of death. * * *

Ohio Rev. Code § 2929.03(D).  The court noted that, pursuant to this statute, a pre-sentence

investigation and/or mental examination report will be ordered "only on the request of the

defendant."  Once requested, however, "the statute requires that these reports must be given to

the court, the jury, and the parties, and that they shall be considered during sentencing." *Id.*

The court rejected Esparza's claim that mandatory submission of the PSI and mental

examination reports to the jury was error, noting that "having requested the pre-sentence report

and mental examination, [Esparza] cannot be heard to complain of its submission to the jury,

since the statute so requires." *Id.* at 10.  The court also rejected Esparza's claim that counsel

were ineffective for requesting the reports in the first instance "as the decision to request the pre-

sentence report was clearly one of sound trial strategy." *Id.*

With respect to Esparza's argument regarding his request for an independent

psychologist, the court found this argument was based on the "erroneous belief" that §§

2929.024 and 2929.03(D) are "intertwined." *Id.* at 9.  To the contrary, the court explained these

provisions are completely separate and the trial court, when requested by Esparza to order a PSI

or mental examination under 2929.03(D), was not required to appoint a psychologist of

Esparza's choosing. *Id.* at 11.  The court further noted:

> As further support for the appointment of an independent psychiatrist of his
> own choosing, [Esparza] contends the reports prepared by the court-appointed
> [CDTC] were prepared without adequate guidelines and without adequate
> time.  As a result, he alleges, the jury was told of the availability of statutory
> mitigating factors which he did not intend to establish, thus in effect

presenting the jury with non-statutory aggravating circumstances. This
argument is without merit.  The jury was properly instructed on the
aggravating circumstances and mitigating factors it was to consider.  The
reports submitted were prepared in substantially the same manner as the
[CDTC] had done in prior cases.  [Esparza] was not entitled to a 'rebuttal'
presentence investigation and mental examination prepared by a second
psychologist or psychiatrist of his own choosing also at state expense.  As we
made clear in *State v. Williams* (1986), 23 Ohio St.3d 16, 23, 23 OBR 13, 19,
490 N.E.2d 906, 913 , "[a]ll that due process requires with respect to post-
conviction reports is giving the defendant a chance to rebut any alleged
inaccuracies." [citations omitted]

Here, the record reflects that defense counsel not only had the opportunity but
took the opportunity to impeach the reliability and accuracy of the report
during cross-examination of its authors, Drs. Cassell and Seman.  Counsel's
questioning carefully brought out the short time (two days) in which the
report was prepared as well as its alleged incompleteness (e.g. using the
juvenile court's family file instead of personally interviewing family
members).  Despite these claimed shortcomings, [Esparza] received thorough
and appropriate psychological testing from two independent, competent
psychologists.

*Id*. at 10-11.

With respect to Esparza's claim that counsel were ineffective for submitting the Family

File to the jury during mitigation, the court found that "given the sound trial strategy in

admitting the family file as [Esparza's] most persuasive argument against the imposition of the

death penalty, [Esparza] has failed to establish a 'substantial violation of an essential duty owed

by the defense counsel to the defendant.'" *Id*. at 15 (quoting *State v. Cooperrider* (1983), 4 Ohio

St.3d 226, 228, 4 OBR 580, 582, 448 N.E.2d 452, 454).

Finally, the court summarily denied Esparza's claim that the trial court erred in denying

his request for a continuance, finding that "[a]s the request was indefinite as to duration and

vague as to its purpose, its denial was not an abuse of discretion."  *Id*. at 11.

Esparza filed a Petition for Post-Conviction Relief on November 23, 1989, raising fifty

grounds for relief.  Among other things, Esparza alleged trial court error and ineffective assistance during the mitigation phase, including arguments regarding (1) the submission of the PSI, CDTC mental examination report, and Family File; and (2) defense counsel's alleged failure to thoroughly investigate and present evidence in mitigation.  Esparza also alleged the trial court erred in denying his motion for continuance and motion for an independent psychologist.  (ECF # 191-1).

In support of his Petition, Esparza attached the affidavits of fourteen family members and/or friends,[16] in which they assert they were either not interviewed at all by defense counsel or were interviewed but not asked to testify on Esparza's behalf.  (ECF # 191-1 at 129-165). Esparza also attached the affidavits of Peter Esparza, Virginia Gonzalez, and Ralph Grennay, each of whom did testify during mitigation but who assert in their affidavits that they possessed additional information which they were not requested to include in their testimony.  (ECF # 191-1 at 166- 175).  These affidavits (seventeen in all) include further information regarding the poverty, abuse, and abandonment experienced by Esparza during his childhood and adolescence. Finally, Esparza attached the affidavit of psychologist Julia Hawgood, who conducted an evaluation and interview  of Esparza for purposes of his post-conviction proceedings.  This affidavit (1) repeats much of the same  information regarding Esparza's background; (2) states that the CDTC's diagnosis of anti-social personality disorder was superficial and the mental

---

[16]     Specifically, Esparza submitted the affidavits of (1) Julia Kline (sister); (2) Ruth Esparza (sister); (3) Ray Esparza (brother); (4) Lisa Esparza (sister); (5) Angelina Beltran (aunt); (6) Guadalup Escamilla (aunt); (7) Antonio Gonzales (uncle); (8) Laura Alvarez (great aunt); (9) Anita Almagauer (first cousin of Esparza's mother); (10) Sandy Braley (father's former common-law wife); (11) Marietta Grennay (foster mother); (12) Catherine Stegg (girlfriend and mother of Esparza's son); (13) Michael Walsh (former probation counselor); and (14) Dan Pompa (former probation counselor).  (ECF # 191-1 at 129-165).

examination report did not fully explain the nature of this disorder; and (3) concludes that neither defense counsel nor the jury had a "fully developed understanding" of Esparza.  (ECF # 191-1 at 176-186).

The trial court denied Esparza's Petition without a hearing.  The court concluded that Esparza was precluded under the doctrine of *res judicata* from raising his IAC claims to the extent they did not resort to evidence *dehors* the record. The court further found Esparza had failed to set forth sufficient evidentiary documents outside the record to support his IAC claims and, thus, any claims based on evidence *dehors* the record were also barred.  (ECF # 16 at Exh. Q).

On appeal, the state appellate court determined the majority of Esparza's IAC during the mitigation phase claims were properly dismissed by the trial court on the basis of *res judicata*. It did find, however, that one of his IAC claims – that defense counsel were ineffective for failing to fully and thoroughly investigate and present evidence in support of mitigation– could arguably be raised  in post-conviction. With respect to this claim, the appellate court found as follows:

> During the penalty phase of Esparza's capital trial, his counsel called as mitigation witnesses Richard DeLaRose (Esparza's grandfather), Virginia Gonzales (Esparza's aunt), Peter Esparza (Esparza's brother), Ralph Grennay (Esparza's foster father), and Dr. William Seman, a clinical psychologist at the  [CDTC], who conducted a competency examination of Esparza upon a referral from the court.  Through the testimony of these witnesses, a thorough picture of Esparza's traumatic life was presented to the jury and the trial judge.  In addition, the jury and court were presented with a detailed juvenile court family file (Joint Exhibit A) concerning Esparza's history, character and background.  The Supreme Court of Ohio, in its review of Esparza's capital trial on direct appeal, even recognized the admission of this family file as Esparza's "most persuasive argument against the imposition of the death penalty." *State v. Esparza*, supra, at 15.  Moreover, in its independent weighing of the aggravating factor and the mitigating circumstances, as

expressed in its opinion regarding sentencing of May 22, 1984, the trial court's consideration of Esparza's background is evident:

'The matter of other factors relevant to whether the offender should receive a death sentence must be considered. Here we encounter the lamentable conditions defendant endured throughout his babyhood, boyhood and adolescence. Defendant was born to a brutal and selfish father and an apparently submissive and ineffective mother. While in that home he was semi-starved, underclothed and sometimes unclothed, ill-shod and sometimes unshod; beaten and otherwise abused, rejected, ignored, deserted and everything but properly cared for. The same was, of course, true of his numerous siblings. His mother, who we gather loved him and whom he certainly loved, died in the defendant's ninth year. During his sad childhood and adolescence the defendant was variously placed in a children's home, briefly and unsuccessfully tried living with his maternal grandparents, was placed in foster homes, was committed to the Youth Commission, existed in another unhappy family setting when his father remarried, and generally was bounced from pillar to post. This Court has encountered cases of more miserable upbringing, but, praise God, not often. We doubt not that such conditions have marked the defendant, but from the evidence we cannot conclude that those conditions have served to compel or inexorably lead defendant to his criminalistic and violent tendencies. We find of the nine siblings who shared this background, defendant alone has compiled any serious criminal record. We find that all corrective measures provided or offered to attain for the defendant a better life, have been, soon or late (mostly soon), rejected by defendant.'

In Ohio, a properly licensed attorney is presumed competent and the burden is upon appellant to show counsel's ineffectiveness. *State v. Hamblin* (1988), 37 Ohio St.3d 153, 155-56. . . Moreover, in *Strickland v. Washington* (1984), 466 U.S. 668, the court set forth a two-part test for reviewing claims of counsel ineffectiveness. First, appellant must establish that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment. Second, appellant must establish that the deficient performance prejudiced appellant. *Id*. at 687.

Upon a thorough and careful review of the penalty proceedings in petitioner's capital trial, we conclude that trial counsel's failure to interview or call all potential mitigation witnesses did not amount to ineffective assistance of counsel. Through the evidence presented, it is clear that counsel reasonably investigated and prepared for the sentencing phase and that Esparza's developmental history was clearly placed before the jury. Moreover, because the issue of ineffective assistance of counsel during the penalty phase of the capital trial can be determined upon a review of the record, and without resort

-54-

to evidence *dehors* the record, the trial court did not err in dismissing the fiftieth cause of action without a hearing.

*State v. Esparza*, 1992 WL 113827 at ** 6-7 (Ohio App. 6 Dist. May 29, 1992).  Esparza appealed to the Ohio Supreme Court.  That court dismissed his appeal as involving no substantial constitutional question.  *State v. Esparza*, 65 Ohio St.3d 1453 (1992).[17]

In June 1993, Esparza filed a motion for delayed reconsideration pursuant to *State v. Murnahan*, 584 N.E.2d 1204 (1992).  In this motion, Esparza raised sixteen assignments of error which he alleged his appellate counsel should have raised on direct appeal, including several relating to the admission of the PSI/mental examination reports and IAC during the mitigation phase of the trial.  Ultimately, all of Esparza's claims were denied.[18]

## C.    Denial of Continuance Claim (Claim 39)

In his Thirty-Ninth Claim for Relief, Esparza argues the trial court violated his constitutional rights when it denied his request for a continuance in order to have additional time to prepare for mitigation.[19]  Esparza emphasizes defense counsel were given only one day to

---

[17]    In November 1991, after receiving documents from the City of Toledo pursuant to a public records request, Esparza filed a second petition for post-conviction relief in the Lucas County Court of Common Pleas.  (ECF # 16 at Exh. V).  As of the filing of the Petition and Return, the state trial court had not yet ruled on Esparza's successive petition.  However, in its Supplemental Brief filed August 29, 2011, Respondent states the trial court denied this petition and that the state appellate court affirmed. (ECF # 178 at 2).

[18]    The state appellate court ordered Esparza's direct appeal reopened to consider an alleged structural error involving the propriety of an *ex parte* certification hearing during which the trial judge received inadmissible, prejudicial evidence regarding Esparza.  *State v. Esparza*, 1994 WL 395114 (Ohio App. 6th Dist. July 27, 1994).  After reopening, the state appellate court reaffirmed the trial court and the Ohio Supreme Court denied his appeal.  *See State v. Esparza*, 1995 WL 302302 (Ohio App. 6th Dist. May 19, 1995); *State v. Esparza*, 74 Ohio St.3d 660 (1996).

[19]    Esparza maintains this claim has "Sixth Amendment right to effective counsel and right to present a defense as well as Fourteenth Amendment due process components."  (ECF # 174 at 9).

review the PSI and mental examination reports before mitigation proceedings commenced. (ECF # 2 at 66).  He argues he was prejudiced by the trial court's failure to grant a continuance because it left defense counsel with inadequate time to prepare, which in turn effected the quality of the PSI and mental examination reports and prevented defense counsel from presenting to the jury "all of the necessary information it needed to make an informed sentencing decision."  (ECF # 2 at 67).

Respondent maintains the Ohio Supreme Court's decision affirming the trial court's denial of the continuance is not contrary to or an unreasonable application of clearly established federal law because Esparza's trial counsel failed to set forth any specific reason for a continuance and failed to indicate how long of a continuance was needed.  (ECF # 16 at 149-50).  Respondent further maintains Esparza has failed to demonstrate prejudice because he "never connects the denial of the continuance to specific information or testimony he could have presented at sentencing that would have influenced the fact-finder to reject the death penalty." (ECF # 170 at 21).  Because Esparza failed to articulate a "justifiable basis" for a continuance, and further failed to show prejudice from the denial, Respondent argues the trial court's decision to deny Esparza additional time to prepare for mitigation was reasonable.  (ECF # 170 at 21).

A trial court's decision to grant or deny a continuance is a matter of discretion.  *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).  Denial of a continuance rises to the level of a constitutional violation only when there is "an unreasoning and arbitrary 'insistence upon expeditiousness in

---

The standards governing review of this claim are similar, whether asserted under the Sixth Amendment or due process principles. *See Beuke v. Houk*, 537 F.3d 618, 641 (6th Cir. 2008).  Thus the Court will consider both the Sixth Amendment and due process "components" of this claim jointly, below.

-56-

the face of a justifiable request for delay' . .. " *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983)

(quoting *Ungar*, 376 U.S. at 589). *See also Beuke*, 537 F.3d at 641; *Burton v. Renico*, 391 F.3d

764, 772 (6th Cir. 2004). As the Supreme Court has explained,

> There are no mechanical tests for deciding when a denial of a continuance is
> so arbitrary as to violate due process. The answer must be found in the
> circumstances present in every case, particularly in the reasons presented to
> the trial judge at the time the request is denied.

*Ungar*, 376 U.S. at 589. In addition, to demonstrate reversible error, a petitioner must also show

that the denial of his request resulted in actual prejudice to his defense. *See Landrum v.*

*Mitchell*, 625 F.3d 905, 927 (6th Cir. 2010); *Powell v. Collins*, 332 F.3d 376, 396 (6th Cir. 2003).

"Actual prejudice may be demonstrated by showing that additional time would have made

relevant witnesses available or otherwise benefitted the defense." *Powell*, 332 F.3d at 396.

The relevant factors to be considered in determining whether a continuance was properly

denied include: (1) the length of the requested delay; (2) whether other continuances had been

requested and granted; (3) whether the delay was for legitimate reasons; (4) the inconvenience to

the parties, witnesses, counsel, and the court; (5) whether the defendant contributed to the

circumstances giving rise to the request; (6) whether denying the continuance resulted in

prejudice to the defendant; and (7) the complexity of the case. *See Landrum*, 625 F.3d at 928;

*Powell*, 332 F.3d at 396.

Esparza first raised this issue during his direct appeal to the state appellate court. That

court held as follows:

> [Esparza] next contends that the trial erred when it denied [his] request for a
> continuance. For the following reasons, we reject [Esparza's] contention and
> find that the trial court did not abuse its discretion when it refused [Esparza's]
> requested continuance.

-57-

Whether or not the grant or denial of a continuance is appropriate depends on several factors. In *State v. Unger* (1981), 67 Ohio St.2d 65, 67-68, the court listed the factors as follows: "the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique factors of each case."

These factors are by no means the exclusive test. The court in *Unger, supra*, recognized that the grant or denial of a continuance is a matter within the sound discretion of the trial court. As it is a discretionary matter, a court should implement a balancing test which takes cognizance of all competing considerations. These principles and the foregoing list of relevant factors to consider were approved of and followed in *State v. Sowders* (1983), 4 Ohio St.3d 143.

Initially, we note that *Unger, supra,* applies to capital punishment proceedings. The Supreme Court of Ohio recognized the principles of *Unger, supra* in *Johnson, supra* at 95, a capital punishment case.

Applying the *Unger* objective test to the circumstances of this case, we find that: [Esparza] failed to specify how much time was needed as [Esparza] made an open-ended request for a continuance with no specific time frame; two previous requests were made and received, and a further continuance proved inconvenient in light of the previous two delays; [Esparza] failed to articulate legitimate reasons for a continuance; and defense counsel requested a continuance because counsel was displeased with the results of the medical report.

While we recognize the serious nature of capital punishment proceedings, the request was indefinite and for the purpose of obtaining additional records which would have been cumulative in nature, repeating characterizations of [Esparza] as possessing an antisocial personality disorder. Furthermore, the medical report would never have been issued but for [Esparza's] request.

For the foregoing reasons, we find [Esparza's] Assignment of Error No. 5 not well-taken.

*State v. Esparza*, 1986 WL 9101 at *15 (Ohio App. 6 Dist. Aug. 22, 1986).

Esparza raised this issue again during his direct appeal to the Ohio Supreme Court. That

-58-

court ruled succinctly on this issue as follows: "[Esparza's] final contention under his first proposition of law, that his motion for continuance prior to the sentencing hearing should have been granted, is also without merit.  As the request was indefinite as to duration and vague as to its purpose, its denial was not an abuse of discretion."  *State v. Esparza*, 39 Ohio St.3d 8, 11 (1988).

As set forth *supra*, because the state court considered this claim on the merits, Section 2254(d) applies and this Court is limited under *Pinholster* to considering only that evidence that was before the state courts.  *Cullen v. Pinholster*, 131 S.Ct. 1388 (2011).  This Court must, therefore, decide whether the state court's decision was contrary to, or an unreasonable application of, clearly established federal law based on the factual record the state court had before it when it rendered its decision.  28 U.S.C. § 2254(d)(1).

For the following reasons, the Court finds the state court's resolution of Esparza's claim is not contrary to, or an unreasonable application of, clearly established federal law.[20]  As set forth *supra*, Esparza's motion for a continuance was not the first time Esparza had requested the trial date be postponed.  Indeed, the trial court had already granted two continuances of the trial

---

[20]    Esparza argues this Court should apply a *de novo* review of this claim because, in denying this claim, the Ohio Supreme Court did not acknowledge any clearly established Supreme Court precedent or cite to any federal constitutional provision, statute, or rule.  (ECF # 174 at 9).  Instead, Esparza maintains, the Ohio Supreme Court relied entirely on state law to determine the trial court had not abused its discretion.  The Court rejects this argument.  The state appellate court discussed this claim in detail and cited *State v. Unger*, 67 Ohio St.2d 67 (1981), which expressly references the United States Supreme Court's decision in *Ungar v. Sarafite*, 376 U.S. 575 (1964) and the factors set forth therein for reviewing a trial court's denial of a continuance.  While the Ohio Supreme Court's discussion of this claim is more brief, it also considers several of the factors set forth by the U.S. Supreme Court in *Ungar*, including the length of the delay requested and the reasons given for the delay.  Under these circumstances, the Court finds this is sufficient to invoke deferential review under § 2254.

-59-

date, each at Esparza's request.  Specifically, one week before the initial trial date of January 23,

1984, Esparza's previous defense counsel requested a continuance to allow its private

investigator to conduct witness interviews.  The trial court granted this request, and set a new

trial date of March 5, 1984.  Three days before this trial date, Esparza's lead defense counsel

sought to withdraw due to a conflict of interest.[21]   The trial court allowed counsel to withdraw

and Esparza's remaining counsel, Mr. Stebbins, moved for a continuance.  The trial court

granted the motion in order to allow new counsel time to familiarize themselves with the case.

A new trial date was set for April 30, 1984, over six months after Esparza's October 1983

indictment.

Trial commenced as scheduled on April 30, 1984.  Esparza's new counsel did not

request a continuance to prepare for mitigation until one day before mitigation proceedings were

set to begin, at which point the jury had already rendered its verdict and been sequestered.  In its

motion, counsel did not specify the duration of the continuance it was seeking and only vaguely

alluded to the reasons necessitating their request.  Specifically, the Motion stated a continuance

was necessary for the purpose of permitting defense counsel the opportunity to "gather reports,

records, and other information which would relate to factors in mitigation of the imposition of

the sentence of death."  (ECF # 43 at Exh. TT-38 at 1).  No specific records, reports or "other

information" were identified.  During argument on Esparza's motion, defense counsel did state,

in objecting to the CDTC mental examination, that "there [was] information which we couldn't

---

[21]   The State argued lead defense counsel should have been aware of this conflict of interest
much earlier, as it involved a witness identified by the State in discovery the previous month.  (Tr.
3/2/84 Pretrial Hrg. at 8).  It appears from the record that co-defense counsel neglected to provide
the witness list to lead counsel until several days before trial.  (Tr. 3/8/84 Pretrial Hrg. at 9).

get in time," including records/reports from Ohio's Department of Youth Services regarding Esparza's juvenile commitments in the TICO, Indian River, and Cuyahoga Hills correctional facilities.  (Tr. Mit. Hrg. at 13).  However, it is not clear from this statement (1) whether such juvenile records existed; (2) if they did exist, how long it would take to get them; or (3) whether any such records would have contained  information that was not cumulative to the information already contained in Esparza's Family File.[22]  Finally, assuming these records were vitally important, defense counsel failed to explain why they could not have been obtained during the previous six months, either by them or by Esparza's previous defense counsel.

Nor is there any indication defense counsel needed additional time to contact or interview specific witnesses.  At best, it can be inferred from the Motion's contemporaneous request for funds to employ an independent psychologist that defense counsel's desire for additional psychological testing  also motivated the request for a continuance.  The record reflects, however, that defense counsel did not make any request for funds to employ an independent psychologist until May 4, 1984, after trial had already commenced.  The record reflects neither Esparza's previous defense counsel (Stebbins or Zemmelman) or his counsel at trial (Sparrow or DeNune) made any effort to obtain funds for psychological testing prior to this point.  After the jury returned a guilty verdict, defense counsel specifically requested a mental examination be conducted by independent psychologist, Dr. Charles Layne.  Because they made their request pursuant to Ohio Rev. Code § 2929.03, however, the court had discretion to choose the psychologist and instead chose to appoint the CDTC to conduct the mental examination.

---

[22]    Esparza does not include records from any of these juvenile institutions in his Petition for Post-Conviction Relief or his Successor Petition for Post-Conviction Relief.

-61-

The fact, then, that counsel did not have the independent mental examination they desired was due to (1) their failure to request funds for an independent psychological expert earlier in the proceedings; and (2) the fact that they requested a mental examination pursuant to § 2929.03 which gave the court discretion to choose the examiner.

Moreover, upon defense counsel's request, the trial court did give Esparza additional time to review the PSI and mental examination reports before beginning mitigation proceedings. These reports were provided to the parties on Saturday, May 12, 1984.  The court had hoped to commence mitigation proceedings two days later on Monday, May 14, 1984.  Instead, however, it granted Esparza's request to delay until Tuesday, May 15th, to allow defense counsel additional time to review the reports and prepare their mitigation case.

In light of the above, the Court finds the Ohio Supreme Court did not unreasonably apply federal law when it affirmed the trial court's denial of Esparza's motion for continuance.  The trial court had repeatedly delayed the trial to allow defense counsel time to prepare.  Defense counsel's request for a continuance came the day before mitigation was set to begin and failed to specify the length of the delay that was requested.  Moreover, defense counsel did not provide sufficient detail as to why the continuance was necessary.  *See e.g. Beuke*, 537 F.3d at 641-41 (finding that defense counsel's "generalized objections" that they had "inadequate" time to prepare were insufficient to demonstrate a "justifiable request" for a continuance).  Accordingly, the Court finds the Ohio Supreme Court did not err in finding Esparza failed to make a "justifiable request" for a continuance.  *See Morris*, 461 U.S. at 11-12.

The Court further finds Esparza's claim fails because he has not established actual prejudice.  Even if Esparza had been granted a continuance, it would not have prevented the

admission of the PSI and mental examination reports and consideration of those reports by the jury. As set forth *supra*, these reports contained damaging information about Esparza's juvenile and adult criminal records, history of drug and alcohol abuse, and anti-social personality disorder. Esparza did not explain, to any of the state courts, what additional juvenile court records would have shown, or how they might have mitigated the damage caused by the PSI/mental examination reports. Further, he did not identify, either in the trial court or on direct appeal, any additional fact witnesses he would have called or how an independent psychological examination would have helped his mitigation defense.[23] Accordingly, the Court finds Esparza has not shown actual prejudice resulting from the trial court's denial of his request for a continuance.

The Court therefore finds the state court's resolution of this claim was not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, Esparza's Thirty-Ninth Claim for Relief is denied.

**D.      Ineffective Assistance of Counsel During Mitigation (Claim 44)**

In his Forty-Fourth Claim for Relief, Esparza argues defense counsel were ineffective during mitigation proceedings because they failed to conduct a thorough mitigation investigation. Specifically, Esparza argues counsel neglected to (1) interview or call as mitigation witnesses numerous family members and friends; (2) fully elicit all relevant information from the family members they did call as mitigation witnesses; (3) collect all

---

[23]    Even if this Court were to consider the affidavits of family members/friends submitted in connection with Esparza's first post-conviction petition, the Court finds Esparza has still not shown actual prejudice because these affidavits are largely cumulative to evidence presented by defense counsel during mitigation. *See* Section V.D.1.a, *infra*.

relevant social history and/or psychological records to document Esparza's personal history and development; (4) introduce evidence regarding cultural differences in the Hispanic community and how these differences impacted Esparza's development and behavior; or (5) "fully explain" Esparza's substance abuse.  (ECF # 2 at pp. 72-78).

Esparza also argues defense counsel were ineffective because of their "desperate" and uninformed decision to ask the Court to order PSI and mental examination reports.  Esparza argues defense counsel's lack of preparation placed them in a situation where they had "no alternative" but to request that the Court order these reports, each of which contained extremely damaging information.  With respect to the PSI, Esparza argues that requesting this report was ineffective because the Lucas County Probation Department "had no training with respect to capital cases," incomplete records/information about Esparza's life, and insufficient time to conduct the PSI.  (ECF # 2 at 74-75).  With respect to the mental examination report, Esparza maintains defense counsel failed to provide the psychologists who evaluated him with a detailed social history, and then failed to consult with Dr. Seman before calling him as a witness.  (ECF # 2 at 75-76).  Moreover, in his cross-briefs, Esparza argues defense counsel failed to fully understand the implications of requesting a PSI and mental examination report pursuant to § 2929.03; i.e. that once requested, those reports would be submitted in full to the jury and conducted by examiners chosen by the trial court.  Additionally, Esparza maintains counsel were ineffective for introducing Joint Exhibit A during mitigation because it contained prejudicial documentation regarding Esparza's extensive prior criminal record.  (ECF # 2 at 76). [24]

---

[24]    In his Petition, Esparza also argues defense counsel were ineffective for failing to (1) call Albert Richardson to testify during the guilt phase; (2) lay a proper foundation for admission of a letter written by Esparza to his foster parents, the Grennays; (3) object to numerous instances of

To succeed on an ineffective assistance of counsel claim, a petitioner must satisfy the familiar two-prong test for ineffective assistance of counsel set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  First, the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id* at 687.  To determine if counsel's performance was "deficient" pursuant to *Strickland*, a reviewing court must find that the representation falls "below an objective standard of reasonableness." *Id.* at 688.  A court considering an ineffective-assistance claim "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. –, 131 S. Ct. 770, 787 (2011) (quoting *Strickland*, 466 U.S. at 689).

The petitioner also must demonstrate that he or she was prejudiced by counsel's errors.  To do this, a petitioner "must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Harrington*, 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 694).  "It is not enough 'to show that the

_____

prosecutorial misconduct; or (4) object to erroneous jury instructions. (ECF # 2 at 75-77).  With respect to counsel's failure to call Albert Richardson during mitigation, the Court rejects this claim. Mr. Richardson, a jailhouse informant, testified during the guilt phase of the proceedings that Esparza did not mean to hit Gerschultz when he fired the shot, that it was meant to be a warning, and that Esparza called the convenience store that night to check on her well-being.  (Tr. Vol. III at 1452).  Although it might have been helpful to have Mr. Richardson testify again during mitigation, the Sixth Circuit has held that where a jury is privy to evidence introduced during the guilt phase, counsel need not reintroduce such evidence during mitigation proceedings. *See Gillard v. Mitchell*, 445 F.3d 883, 896 (6th Cir. 2006).  With respect to Esparza's arguments regarding the trial court's exclusion of his letter to the Grennays and counsel's failure to object to instances of prosecutorial misconduct and the court's mitigation jury instructions, the Court rejects these arguments. This Court rejected the underlying bases for each of these claims in its October 13, 2000 Opinion & Order. *See* ECF #132 at 97-104, 106-17 (rejecting Claims 43, 45, and 48).

errors had some conceivable effect on the outcome of the proceeding.'" *Id*. (quoting *Strickland*, 466 U.S. at 693).  "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id*. (quoting *Strickland*, 466 U.S. at 687).  If a petitioner fails to prove either deficiency or prejudice, then the ineffective assistance of counsel claims must fail.  *Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006) (citing *Strickland*, 466 U.S. at 697).

In the instant case, Esparza's claim essentially challenges the adequacy of defense counsel's investigation, preparation, and presentation of available evidence during the mitigation phase of his trial.  It is by now well-settled that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Strickland*, 466 U.S. at 691.  In assessing whether an attorney's mitigation investigation was reasonable, a reviewing court must consider "not only the quantum of evidence already known to counsel, but whether that evidence should have led a reasonable attorney to investigate further."  *Wiggins v. Smith*, 539 U.S. 510, 527 (2003).[25]  This Court must also consider whether the mitigation investigation was reasonably complete, and whether the excluded evidence actually differed from what was presented during mitigation in a substantial way.  *Jalowiec v. Bradshaw*, 657 F.3d 293, 319 (6th Cir. 2011).  *See also Fears v. Bagley*, 2012 WL 516169 at * 10 (6th Cir. Feb. 16, 2012).

The Sixth Circuit has found that the "failure to investigate possible mitigating factors

---

[25]     This Court can rely on *Wiggins*, as well as other cases that postdate the state courts' decisions in this case, because *Wiggins* "did not rest on 'new law' but instead 'applied the same 'clearly established' precedent of *Strickland*.'" *Johnson v. Bagley*, 544 F.3d 592, 599 (6th Cir. 2008) (quoting *Wiggins*, 539 U.S. at 522).  *See also Foust v. Houk*, 655 F.3d 524, 534 n. 3 (6th Cir. 2011).

and failure to present mitigating evidence at sentencing can constitute ineffective assistance of counsel under the Sixth Amendment." *See e.g. Martin v. Mitchell*, 280 F.3d 594, 612 (6th Cir. 2002); *Foust v. Houk*, 655 F.3d 524, 534-35 (6th Cir. 2011).  In assessing these types of claims, the Sixth Circuit has generally considered the scope and degree of counsel's mitigation investigation.  As that court recently explained, "[o]ur circuit's precedent has distinguished between counsel's *complete* failure to conduct a mitigation investigation, where we are likely to find deficient performance, and counsel's failure to conduct an *adequate* investigation, where the presumption of reasonable performance is more difficult to overcome." *Beuke v. Houk*, 537 F.3d 618, 643 (6th Cir. 2008).

In conducting this review, a federal habeas court must strongly presume that counsel's conduct was reasonable and might be part of a trial strategy. *Strickland*, 466 U.S. at 689. "'Judicial scrutiny of a counsel's performance must be highly deferential' and . . . 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Bell v. Cone*, 535 U.S. 685, 698 (2002) (quoting *Strickland*, 466 U.S. at 689). Moreover, the Supreme Court has recently emphasized that "even a strong case for relief does not mean that the state court's contrary conclusion was unreasonable." *Harrington*, 131 S.Ct. at 786.  The question is not whether a federal habeas court would have come to a different conclusion than the state courts but, rather, "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id*. at 788.

> **1.    Failure to Present Testimony from Additional Mitigation Witnesses, Collect Social History Documentation, or Call Cultural and Substance Abuse Experts**

Esparza first argues counsel were ineffective for failing to (1) present testimony from additional mitigation witnesses; (2) collect more extensive social history documentation; and (3) call cultural and substance abuse experts. He raised these claims for the first time during post-conviction, supporting them with affidavits of numerous family members and friends who defense counsel failed to interview, call as witnesses, and/or fully prepare for mitigation. The state appellate court considered this claim on the merits and rejected it as follows:

> During the penalty phase of Esparza's capital trial, his counsel called as mitigation witnesses Richard DeLaRose (Esparza's grandfather), Virginia Gonzales (Esparza's aunt), Peter Esparza (Esparza's brother), Ralph Grennay (Esparza's foster father), and Dr. William Seman, a clinical psychologist at the [CDTC], who conducted a competency examination of Esparza upon a referral from the court. Through the testimony of these witnesses, a thorough picture of Esparza's traumatic life was presented to the jury and the trial judge. In addition, the jury and court were presented with a detailed juvenile court family file (Joint Exhibit A) concerning Esparza's history, character and background. The Supreme Court of Ohio, in its review of Esparza's capital trial on direct appeal, even recognized the admission of this family file as Esparza's "most persuasive argument against the imposition of the death penalty." *State v. Esparza*, supra, at 15.
>
> * * *
>
> **Upon a thorough and careful review of the penalty proceedings in petitioner's capital trial, we conclude that trial counsel's failure to interview or call all potential mitigation witnesses did not amount to ineffective assistance of counsel. Through the evidence presented, it is clear that counsel reasonably investigated and prepared for the sentencing phase and that Esparza's developmental history was clearly placed before the jury.**

*State v. Esparza*, 1992 WL 113827 at ** 6-7 (Ohio App. 6 Dist. May 29, 1992) (emphasis added). Esparza appealed to the Ohio Supreme Court, which dismissed his appeal as involving no substantial constitutional question. *State v. Esparza*, 65 Ohio St.3d 1453 (1992).

Because the state court considered this claim on the merits, Section 2254(d) applies and

-68-

this Court is limited under *Pinholster* to considering only that evidence that was before the state

courts.  *Cullen v. Pinholster*, 131 S.Ct. 1388 (2011).  This Court must, therefore, decide whether

the state court's decision was contrary to, or an unreasonable application of, clearly established

federal law based on the factual record the state court had before it when it rendered its decision.

28 U.S.C. § 2254(d)(1); *Mason v. Mitchell*, 325 F.3d 732, 737-38 (6th Cir. 2003) (holding

ineffective assistance of counsel is mixed question of law and fact to which the unreasonable

application prong of Section 2254(d)(1) applies).

### a.      Mitigation Witnesses

Esparza argues defense counsel were ineffective because they failed to call the following

family members/friends as mitigation witnesses:  (1) Julia Kline (sister); (2) Ruth Esparza

(sister); (3) Ray Esparza (brother); (4) Lisa Esparza (sister); (5) Angelina Beltran (aunt); (6)

Guadalup Escamilla (aunt); (7) Antonio Gonzales (uncle); (8) Laura Alvarez (great aunt); (9)

Anita Almagauer (first cousin of Esparza's mother); (10) Sandy Braley (father's former

common-law wife); (11) Marietta Grennay (foster mother); (12) Catherine Stegg (girlfriend and

mother of Esparza's son); (13) Michael Walsh (former probation counselor); and (14) Dan

Pompa (former probation counselor).  (ECF # 191-1 at 129-165).  Esparza maintains these

witnesses would have presented the  following information to the jury:

> 1.      There were rats and cockroaches in the Esparza household.
>
> 2.      There was never any food in the house for the Esparza children.
>
> 3.      Frank Esparza (Petitioner's father) drank excessively. He would often be absent from the household for days. When he would drink he would become violent.
>
> 4.      Frank Esparza would frequently beat his wife and children and would use a broom or belt.

5.      Petitioner received the worst treatment of the Esparza children.

6.      Petitioner's brother Peter was treated much better than Petitioner.

7.      At the age of four or five years, Petitioner was struck by an automobile and rendered unconscious.

8.      Frank Esparza would frequently be involved in fights outside the household.

9.      Beatrice Esparza (Petitioner's mother) verbally abused her children, as she would take out her frustrations.

10.     Beatrice would not attempt to defend the children when they were being  beaten by her husband.

11.     After Frank left his family for the last time, Beatrice began to drink heavily.  She did not care about her children.

12.     Beatrice Esparza would also often absent herself from the home for periods of days.

13.     The Esparza children, prior to being placed in foster homes, were raised by their ten year old sister Ruth.

14.     The Esparza children were removed from their home at an early age in a paddy wagon and placed in an orphanage.

15.     Petitioner was the last of the Esparza children who left the orphanage or Children's Home.

16.     Grandmother, Carmen Dela Rosa, who assisted in raising Petitioner, hated Petitioner and referred to him as the "devil."

17.     Grandfather Richard Dela Rosa hated Petitioner because he was like his father.

18.     Petitioner's grandparents did not have the resources or parenting ability to raise the Esparza children.

19.     One of the times Petitioner left the Children's Home he resided with his father.  His father's girlfriend physically abused Petitioner.

20.     During the same period, Petitioner's father would beat Petitioner in

the area of his genitals.

21.     Petitioner's mother died while he was in the orphanage.  Petitioner
        was particularly affected over the death of his mother.

22.     Petitioner was physically abused by the principal at one of his schools
        while he was in a foster home.

23.     Petitioner helped to raise his brother, Ray, when Ray had no place else
        to live.

24.     Petitioner's brothers and sisters never wanted to be with Petitioner as
        he grew older.

25.     Petitioner was always trying to seek the approval of the other family
        members.

26.     Petitioner was a follower who could easily be talked into committing
        inappropriate acts.

27.     Most of the males in the Esparza family are heavy drinkers.

(ECF # 33 at 92-94).  Esparza also argues defense counsel failed to provide this information to

the CDTC psychologists who examined him for purposes of the mental examination report.

The Supreme Court has noted that "evidence about the defendant's background and

character is relevant [in capital mitigation proceedings] because of the belief, long held by

society, that defendants who commit criminal acts that are attributable to a disadvantaged

background . . . may be less culpable than defendants who have no such excuse."  *Penry v.

Lynaugh*, 492 U.S. 302, 319 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S.

304 (2002).  *See also Sowell v. Anderson*, 663 F.3d 783, 798 (6th Cir. 2011).  Thus, to provide

competent assistance in capital cases, "defense counsel must conduct a reasonably thorough

investigation into all possible mitigation evidence that would present a sympathetic picture of

the defendant's family, social, and psychological background."  *Jells v. Mitchell*, 538 F.3d 478,

495-96 (6th Cir. 2008).  *See also Foust*, 655 F.3d at 534.

That being said, the Sixth Circuit has made clear that "the failure to present additional mitigating evidence that is merely cumulative of that already presented does not rise to the level of a constitutional violation." *Broom v. Mitchell*, 441 F.3d 392, 410 (6th Cir. 2006).  *See also Nields v. Bradshaw*, 482 F.3d 442, 454 (6th Cir. 2007); *Sowell*, 663 F.3d at 795.  To establish prejudice, "the new evidence . . . must differ in a substantial way– in strength and subject matter – from the evidence actually presented at sentencing*." Tibbetts v. Bradshaw*, 633 F.3d 436, 444 (6th Cir. 2011).  A reviewing court may also consider "the volume and compelling nature of the new evidence." *Morales v. Mitchell*, 507 F.3d 916, 935 (6th Cir. 2007).  If the testimony "would have added nothing of value," then its absence was not prejudicial.  *Foust*, 655 F.3d at 539 (citing *Bobby v. Van Hook*, 558 U.S. ----, 130 S.Ct. 13, 19 (2009)).

The Court finds the state appellate court did not unreasonably apply clearly established federal law when it found defense counsel were not ineffective for failing to call the potential mitigation witnesses set forth above.  The information these witnesses would have presented to the jury is largely cumulative to evidence presented by defense counsel during mitigation.  Through the mitigation testimony of Esparza's grandfather, aunt, brother, and foster father, defense counsel introduced graphic evidence regarding the poverty and abuse Esparza suffered as a child.  This included testimony that the Esparza children "had a rough life" and often had no food, shoes, or appropriate clothing.  (Tr. Mit. Hrg. at 35-37, 48-50, 58-59).  These witnesses also testified that Esparza's father was an alcoholic, often absent from the home, and physically abusive to Esparza and his siblings.  (Tr. Mit. Hrg. at 35-38, 51-52, 60).  In addition, defense counsel elicited testimony regarding the death of Esparza's mother and Esparza's subsequent

placement in numerous foster homes.  (Tr. Mit. Hrg. at 34, 38-40, 50, 61, 70).  Esparza's

grandfather testified that, in the years prior to her death, Esparza's mother neglected the children

and often left them under the care of their 10 year old sister, Ruth.  (Tr. Mit. Hrg. at 38-39).  He

further testified the Esparza children were often sent home from school because their hair was

full of lice.  (Tr. Mit. Hrg. at 35).  Esparza's brother testified regarding Esparza's feelings of

loneliness and abandonment at having been separated from family and his continuous foster

placements.  (Tr. Mit. Hrg. at 63-64).

   Much of this evidence, and more along a similar vein, was contained in Joint Exhibit A,

a copy of which was presented to the jury during deliberations.  As set forth *supra*, this Exhibit

contained detailed information regarding Esparza's chaotic and disruptive childhood; the

poverty, neglect and abuse he endured; and his father's alcoholism and violent temper.  (ECF #

193-1 at 4-22; ECF # 185-1 at 34, 39l; ECF # 186-1 at 37-39).  Specifically, documents

contained in Joint Exhibit A indicated that (1) Esparza and his siblings were "poor as hell" and

had no food, clothing, or shoes (ECF #193-1 at 4, 12); (2) Esparza's father was an alcoholic with

an extensive arrest record (i.e. 25 adult arrests by the time Esparza was 12 years old) who often

beat the children and their mother, including Petitioner (ECF # 193-1 at 4, 8, 16); (3) Esparza's

grandfather "didn't like" Petitioner and Esparza's siblings "were afraid of him [Petitioner]."

(ECF # 193-1 at 4, 8).  It also contained documentation regarding an incident in which Esparza's

father's girlfriend physically assaulted Petitioner.  (ECF # 185-1 at 9).  In addition, it contained

lengthy discussions regarding Esparza's feelings of abandonment and loss as a result of his

traumatic childhood.  (ECF #193-1 at 4-22).  Defense counsel explicitly referred to Joint Exhibit

A during closing arguments and encouraged the jury to "[r]ead what is in his family file.  Read

about Gregory Esparza. You heard about him. There is a lot of information about him."  (Tr. Mit. Hrg. at 181).

In light of the above, the Court finds that testimony from the potential mitigation witnesses  Esparza contends his counsel should have investigated and presented does not "differ in a substantial way," in both strength and subject matter, from the testimony and evidence presented by defense counsel during mitigation.  Most of these witnesses' anticipated testimony relates to the poverty and abuse Esparza suffered, his father's alcoholism, his mother's neglect and untimely death, and his numerous foster placements.  This mitigating evidence was presented in great detail via the testimony of the mitigation witnesses that were called, as well as the information contained in Joint Exhibit A.  Unlike cases where the Sixth Circuit has found prejudice as a result of defense counsel's failure to uncover and present new mitigating evidence, this is not a case where counsel merely "scratched the surface" of Esparza's horrific childhood.  *See Foust*, 655 F.3d at 539 (finding  new mitigation evidence was not cumulative because it "paint[ed] an altogether different picture of [petitioner's] childhood").  Here, while perhaps defense counsel could have elicited additional information about Esparza's background, they did call at least three family members to testify in detail regarding the deprivations and abuse Esparza endured.  Moreover, the documents contained in Joint Exhibit A painted a graphic picture of the poverty, abuse, and neglect that characterized Esparza's childhood and adolescence.

The Court recognizes there is some evidence presented in the post-conviction affidavits that was not fully presented during mitigation.  For example, Esparza's maternal great aunt, Laura Alvarez, avers that Esparza was (1) struck by an automobile and rendered unconscious

when he was four or five years old, and (2) dragged by a car and hit his head on the pavement on another occasion. (ECF # 191-1 at 149-150). This evidence was not presented during mitigation. However, Esparza does not explain how this evidence is mitigating in nature. While this testimony might have been significant had Esparza introduced evidence that he suffered from organic brain damage, Esparza failed to do so either during post-conviction or in his Petition or Traverse.[26] Accordingly, the Court finds Esparza has failed to carry his burden of demonstrating that the failure to present this evidence was either deficient or prejudicial.

In addition, the affidavits of Angelina Beltran (maternal aunt), Guadalupe Escamilla (maternal aunt), Laura Alvarez, and Anita Almaguer (first cousin of Esparza's mother) contain additional information regarding Esparza's mother's neglect, drinking, "verbal abuse" of her children, and failure to defend them from their father's violent temper. (ECF # 191-1 at 141-46, 149-152). This evidence was not fully explored during mitigation. Esparza's grandfather did testify that Esparza's mother left the children at home alone "most of the time" and failed to care for them. (Tr. Mit. Hrg. at 38). Moreover, documents contained in Joint Exhibit A indicate the Esparza children were removed from the home by Children's Services because of neglect while under the care of their mother. Indeed, in its sentencing opinion, the trial court acknowledged Esparza's mother's failings, noting "Defendant was born to . . . an apparently submissive and ineffective mother" and, while in his childhood home, he was "semi-starved, underclothed and sometimes unclothed, ill-shod and sometimes unshod, beaten and otherwise abused, rejected, ignored, deserted and everything but properly cared for." (Sentencing Opinion at 6).

---

[26]  While Esparza introduced testimony during the federal evidentiary hearing indicating Esparza suffered from organic brain damage, the Court cannot consider this evidence because it was not before the state courts. *See Pinholster*, 131 S.Ct. at 1398.

The evidence presented on this issue during mitigation is arguably not as detailed as that set forth in the Beltran, Escamilla, Alvarez, and Almaguer post-conviction affidavits.  However, in light of the volume and graphic nature of the mitigation information that was presented regarding Esparza's horrific childhood, the Court finds this new mitigating evidence is not so substantially different in terms of strength and subject matter to demonstrate prejudice.  *See e.g. Eley v. Bagley*, 604 F.3d 958, 969 (6th Cir. 2010) (stating that "[a]lthough the evidence presented at the post-conviction hearing did go into more depth than the evidence presented by trial counsel at sentencing, it did not cover any new subject matter and was not substantially more persuasive than the trial evidence"); *Wiles v. Bagley*, 561 F.3d 636, 639 (6th Cir. 2009) ("'Most of the ostensibly new evidence represents variations of th[e] same theme' presented at the penalty phase").

The Court also rejects Esparza's argument that defense counsel were ineffective for failing to elicit further information from the mitigating witnesses that were called; i.e. Peter Esparza, Virginia Gonzales, and Ralph Grennay.  In support of his post-conviction petition, Esparza attached affidavits from these three witnesses, detailing the additional information they would have offered had they been properly prepared and questioned.  (ECF # 191-1 at 166-175).  Upon careful review, the Court finds the information contained in these affidavits is largely cumulative of the mitigation testimony already presented at trial.  Although the affidavits present perhaps slightly more detail regarding the poverty, abuse, and chaos experienced by Esparza during his childhood, they do not provide evidence that is substantially different – in

both strength and subject matter–from that which was presented at trial.[27]  Accordingly, the

Court finds Esparza has not demonstrated he was prejudiced by counsel's failure to elicit this

additional information from his mitigation witnesses.

> **b.**     **Social History and Psychological Records**

Esparza next argues defense counsel were ineffective for failing to collect additional

records regarding his social history, childhood, and psychological background.  He maintains

generally that effective assistance in capital cases requires the collection of "extensive

background material," including "medical records, school records, and adult prison records."

(ECF # 2 at 74).  He also faults counsel for failing to obtain records from several of the state

juvenile institutions where he was committed, including TICO, Indian River, and Cuyahoga

Hills.  Esparza maintains defense counsel's failure to obtain these records prejudiced him

because, without them, the jury had an incomplete picture of Esparza's development and

personal history.  He complains defense counsel should have obtained and provided these

records to the CDTC psychologists, which would have assisted them in preparing a more

thorough assessment of Esparza's "psychological and behavioral deficits."  (ECF # 2 at 75).

The Court rejects this argument.  As an initial matter, it is significant to note that Joint

Exhibit A contained numerous records detailing Esparza's social, academic, medical and

psychological history, including Juvenile and Domestic Relations Court records and reports

(ECF # 193-1 at 15-23; ECF # 185-1 at 7-9);  Child Study Institute psychological and

---

[27]     The only possible exception is Mr. Grennay's statement that Esparza was paddled by a
school principal while staying with the Grennays as a foster child.   (ECF # 191-1 at 174).  While
this testimony was not offered in trial, the Court finds defense counsel's failure to elicit this
testimony is not sufficient to rise to the level of a constitutional error.

psychiatric reports from 1975 and 1977 (ECF # 193-1 at 4-14; 44-45); medical records (ECF # 193-1 at 30, 58, 61; ECF # 186-1 at 4); and academic records/summaries (ECF # 185-1 at 33; ECF # 186-1 at 3, 33).  As set forth *supra*, these records went into great detail regarding Esparza's development in terms of his family, childhood, and foster placements.  While Esparza complains defense counsel did not obtain additional, more extensive social history records, he does not indicate what these records would have shown or even that they exist.  Esparza does not direct this Court's attention to any additional school, medical, psychological, or social history records he believes defense counsel should have obtained, and no additional records or social history documentation of any kind are attached to either of Esparza's post-conviction petitions.  In the absence of any such information, the Court finds Esparza has failed to carry his burden of demonstrating either deficient performance or prejudice under *Strickland, supra* with respect to this issue.

### c.     Evidence Regarding Cultural Differences in the Hispanic Community

Esparza argues defense counsel were ineffective because they "failed to learn of the cultural differences inherent in the Hispanic community, which would have aided in explaining Petitioner's developmental history."  (ECF # 2 at 74).  He maintains this omission was prejudicial because "[t]hese cultural differences had a profound and significant impact on Petitioner's development, the way he viewed himself in relation to the rest of society, and the way he behaved."  (ECF # 2 at 74).  In addition, Esparza argues his "culture precludes [him] from identifying for the authorities the individual who committed the homicide and instead caused [him] to brag about the homicide, even though he did not commit it."  (ECF # 33 at 96-97).

Esparza raised this argument in his first post-conviction petition, supporting it with a publication entitled "Cultural and Ethnic Awareness Manual for Professionals Working with Mexican-American Migrant Families." (ECF # 191-1 at 187-201). Esparza does not direct the Court's attention to any particular portion of this Manual that he contends supports his claim, nor does he explain in any detail what mitigating evidence would have been presented in this regard. Further, Esparza does not identify a cultural expert he contends should have been called at trial or submit an affidavit from any such expert indicating what testimony would have been offered.

The Supreme Court has noted that, "among the topics [defense] counsel should consider presenting [in mitigation] are medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and **cultural influences**." *Wiggins*, 123 S.Ct. at 2537 (emphasis added). Several courts have recognized that the failure to present evidence regarding cultural differences can constitute ineffective assistance of counsel. *See e.g. Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999) (noting that "this Court has recognized that the failure to present evidence necessary to bridge a cultural gap may constitute ineffective assistance of counsel"); *Loza v. Mitchell*, 705 F.Supp.2d 773, 812 (S.D. Ohio 2010) (stating that "this Court does not doubt that the failure to obtain a cultural expert can constitute ineffective assistance").

The Sixth Circuit has not addressed in detail the issue of whether or to what extent counsel provides ineffective assistance by failing to present evidence regarding cultural differences. It has, however, rejected this type of claim on several occasions, on the grounds petitioner failed to show a reasonable probability the cultural evidence would have caused the

jury to reach a different outcome.  *See e.g. Durr v. Mitchell*, 487 F.3d 423, 438 (6th Cir. 2007) (petitioner failed to demonstrate prejudice resulting from failure to call cultural expert because expert's affidavit was couched in phrases such as "in my opinion" and "it is doubtful"); *Fears v. Bagley*, 2012 WL 516169 at * 11 (6th Cir. Feb. 16, 2012) (finding no prejudice because petitioner failed to show reasonable probability that, but for the cultural expert's testimony, the jury would have reached a different conclusion).

The Court rejects Esparza's argument that counsel were ineffective for failing to "learn about" and present evidence regarding cultural differences inherent in the Hispanic community. While Esparza states "[t]hese cultural differences had a profound and significant impact on [his] development," he does not indicate with any specificity what mitigation testimony should have been offered on this issue nor does he explain how this testimony would have influenced the jury to reach a different conclusion.  Esparza does not identify any particular portions of the "Cultural and Ethnic Awareness Manual" which he believes should have been presented by counsel, nor does he indicate how the information regarding cultural differences should have been conveyed.  He does not identify or attach an affidavit from a cultural expert who would have testified on Esparza's behalf, nor does he indicate what testimony would have been offered.  In the absence of such information, the Court finds Esparza has failed to demonstrate either deficient performance or prejudice under *Strickland, supra*.

### d.    Substance Abuse Expert

Esparza next argues counsel were ineffective because, although they elicited testimony regarding his substance abuse from several witnesses, they failed to "explain it," thereby rendering this evidence a non-statutory aggravating circumstance.  (ECF # 2 at 76).  He

maintains counsel should have explained to the jury that his consumption of illicit substances was "designed to ease the pain of the constant abuse" he has suffered.  (ECF # 33 at 96).

During the mitigation hearing, several of Esparza's family members testified regarding Esparza's history of drug and alcohol abuse.  Esparza's aunt, Virginia Gonzales, testified Esparza snorted cocaine in her home on one occasion.  (Tr. Mit. Hrg. at 52, 55).  Esparza's brother, Peter, testified Petitioner drank a lot and did "all kinds of drugs," including cocaine, heroin, and dilaudids.  (Tr. Mit. Hrg. at 62-63).  References to Esparza's history of alcohol and drug abuse are found throughout Joint Exhibit A, including documents indicating that, by age 12, Esparza was sniffing glue and using THC and marijuana.  (ECF # 193-1 at 5, 13, 20).  The PSI indicates Esparza had abused alcohol since he was 15 years old and had a history of using heroin, marijuana, and dilaudids.  (PSI at 4).  Finally, the CDTC mental examination report notes Esparza experienced occasional blackouts due to drinking and drugs.  (CDTC Mental Exam. Report at 3).  That report notes that while Esparza "reports over-indulgence in alcohol and has used drugs," there is "some question as to how much of a factor this was" in the events leading up to the death of Melanie Gerschultz.  (CDTC Mental Exam. Report at 5).

The Court finds counsel were not ineffective for failing to "explain" Esparza's substance abuse.  As an initial matter, Esparza does not identify a substance abuse expert he claims should have been called to testify.  The only even brief discussion of this issue occurs in the affidavit of psychologist Julia Hawgood, which was submitted during post-conviction.  (ECF # 191-1 at 176- 186).  Dr. Hawgood does not claim to be an expert on substance abuse issues and, indeed, her affidavit speaks only tangentially regarding Esparza's history of drug and alcohol abuse. Specifically, she notes only that (1) Esparza "most likely" used drugs in order to "anesthetize the

-81-

pain and . . . fortify himself in the tough guy role he felt compelled to enact," and (2) repeated

substance abuse "is a means that people, regardless of social class, have used to anesthetize

psychic pain, frustration and loss throughout time."  (ECF # 191-1 at 182, 184).

The Court finds this evidence is insufficient to demonstrate either deficient performance

or prejudice under *Strickland*.  Dr. Hawgood's statements are nothing more than broad,

generalized pronouncements regarding the reasons Esparza may have abused drugs.  Esparza

fails to demonstrate a reasonable probability that Dr. Hawgood's statements would have led the

jury to reach a different conclusion, particularly given the fact that the underlying events that

caused Esparza to abuse drugs were already presented to the jury in detail.  Moreover, even

considering much stronger evidence, the Sixth Circuit has been reluctant to recognize ineffective

assistance of counsel based on the failure to retain a substance abuse expert.  *See Otte v. Houk*,

654 F.3d 594, 602 (6th Cir. 2011) (noting that "[w]e have rejected many claims of this type

before" and "Otte points to no case . . . in which the failure to retain a substance abuse expert

has been grounds for granting habeas relief").  *See also Clark v. Mitchell*, 425 F.3d 270, 285 (6th

Cir. 2005) (rejecting IAC claim based on failure to obtain substance abuse expert); *White v.

Mitchell*, 431 F.3d 517, 530 (6th Cir. 2005) (same); *Foust,* 655 F.3d at 538 (same); *Tibbetts v.

Bradshaw*, 633 F.3d 436, 442-43 (6th Cir. 2011) (same).

Accordingly, the Court rejects Esparza's claim that counsel were ineffective for failing to

introduce evidence "explaining" his history of substance abuse.

2.     **Decision to Request Pre-Sentence Investigation and Mental
       Examination Reports Pursuant to Ohio Rev. Code § 2929.03.**

Esparza argues counsel were ineffective because they requested the PSI and mental

examination reports without fully understanding that these reports would be submitted in their

-82-

entirely to the jury, or that the mental examination would be conducted by psychologists chosen

by the court.  He further maintains counsel failed to provide either the Lucas County Probation

Department or the CDTC with additional background information that would have informed

their decision, nor did he meet with CDTC psychologist William Seman prior to calling him as a

mitigation witness.  Esparza argues counsel's failure to properly request funds for an

independent expert pursuant to Ohio Revised Code § 2929.024 earlier in the proceedings was

unreasonable and forced defense counsel into a situation where they had no alternative but to

request that the trial court order the PSI and mental examination reports pursuant to § 2929.03,

resulting in their submission to the jury.  Esparza argues this was prejudicial because both the

PSI and the mental examination reports contained a wealth of damaging information and

conclusions regarding, not only the mitigating factors raised by Esparza, but also several

additional mitigating factors that Esparza had specifically elected not to discuss during

mitigation proceedings.

Esparza raised these claims on direct appeal to the Ohio Supreme Court, which rejected

them.  First, the court found the mandatory submission of the PSI and mental examination

reports to the jury was not error because "having requested the pre-sentence report and mental

examination [pursuant to § 2929.03], [Esparza] cannot be heard to complain of its submission to

the jury, since the statute so requires."  *State v. Esparza*, 39 Ohio St.3d 8, 10 (1988).  The court

also rejected Esparza's claim that counsel were ineffective for requesting the reports in the first

instance "as the decision to request the pre-sentence report was clearly one of sound trial

strategy."  *Id.*  Finally, the court rejected Esparza's claim that counsel were ineffective for

introducing Joint Exhibit A (also known as the "Family File") during mitigation, finding that

"given the sound trial strategy in admitting the family file as [Esparza's] most persuasive argument against the imposition of the death penalty, [Esparza] has failed to establish a 'substantial violation of an essential duty owed by the defense counsel to the defendant.'" *Id*. at 15 (citations omitted).

Once again, because the state courts considered this claim on the merits, Section 2254(d) applies and this Court is limited under *Pinholster* to considering only that evidence that was before the state courts. *Cullen v. Pinholster*, 131 S.Ct. 1388 (2011). This Court must, therefore, decide whether the state court's decision was contrary to, or an unreasonable application of, clearly established federal law based on the factual record the state court had before it when it rendered its decision. 28 U.S.C. § 2254(d)(1); *Mason v. Mitchell*, 325 F.3d 732, 737-38 (6th Cir. 2003).

The United States Supreme Court recently emphasized that, in determining whether counsel performed deficiently under *Strickland*, "[w]e begin with the premise that 'under the circumstances, the challenged action[s] might be considered sound trial strategy." *Pinholster*, 131 S.Ct. at 1404 (quoting *Strickland*, 466 U.S. at 689). Indeed, *Strickland* commands reviewing courts to "affirmatively entertain the range of possible 'reasons [defense] counsel may have had for proceeding as they did,'" *Pinholster*, 131 S.Ct. at 1407, and "indulge [the] strong presumption" that counsel "made all significant decisions in the exercise of reasonable professional judgment." *Strickland,* 466 U.S. at 689-90, 692. Moreover, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

-84-

That being said, "[s]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. *See also Wiggins*, 539 U.S. at 528. As the Supreme Court has made clear, an incomplete mitigation investigation resulting from "inattention, not reasoned strategic judgment" is unreasonable, as is abandoning "investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." *Wiggins*, 539 U.S. at 527-28.

Esparza argues the Ohio Supreme Court's decision that defense counsel requested the PSI and mental examination reports for strategic reasons, constitutes an unreasonable application of clearly established federal law. He maintains counsel were grossly unprepared for the mitigation phase of the case, noting that counsel (1) failed to request funds for expert psychological assistance until after the trial had begun; (2) had not obtained the documents "any reasonable attorney would have obtained," and (3) had not spoken to necessary experts and essential family members. (ECF # 179 at 26). Esparza argues counsel "could not have reasonably determined if a presentence investigation was desirable" without having conducted such an initial investigation. (ECF # 33 at 91).

The Court rejects this argument. As an initial matter, Esparza fails to direct this Court's attention to any direct evidence indicating counsel's decision to request the PSI and mental examination was the product of an incomplete mitigation investigation. The state court record does not contain any affidavits or testimony from any of Esparza's trial counsel (either Sparrow, De Nune, Zemmelman or Stebbins), nor does Esparza direct this Court's attention to any billing statements which shed light on the time and effort counsel expended in preparation for

-85-

mitigation.  Moreover, while Esparza did submit affidavits from various family members indicating they had not been interviewed by defense counsel, it is clear that counsel did contact at least four mitigation witnesses, i.e. Peter Esparza, Richard De La Rosa, Virginia Gonzalez, and Ralph Grennay.  The affidavits submitted by these four witnesses do not allege that counsel contacted them in an untimely fashion.

Instead, Esparza asks this Court to infer deficient performance on the part of trial counsel from the fact that the PSI and mental examination ultimately contained damaging information that he believes was detrimental to his mitigation case.  The Court declines to do so.  While the content of the PSI and mental examination reports may have disappointed and surprised trial counsel, it was not unreasonable for the Ohio Supreme Court to find that the decision to request these reports in the first instance was strategic.  During mitigation, defense counsel's strategy was to "explain to [the jury] who Greg Esparza is and how he got to where he is now."  (Tr. Mit. Hrg. at 30).  Counsel emphasized Esparza's chaotic and traumatic childhood, relying heavily on evidence regarding the death of Esparza's mother, the abuse he suffered at the hands of his violent and alcoholic father, and his numerous foster placements.  (Tr. Mit. Hrg. at 31).  Counsel summarized his mitigation case in closing arguments as follows:

> You have heard about Greg's youth, his age, his chaotic and disruptive childhood, the fact that he was constantly moved from place to place, the removal from his family when he was 7 years old, the death of his mother when he was 8, his father. And you have heard about how all of those factors led to the diagnosis of an antisocial personality disorder.
>
> These things explain the kind of person that Greg Esparza is.  They don't excuse what happened.  That's not the purpose to excuse what happened.  And we agree that society demands that he be punished for what happened.  It is the appropriateness of the punishment that is the issue here.
>
> And I am going to ask you now to do what you did when you considered the

-86-

evidence in what I call the guilt phase of this trial, and that is, take your time, weigh it carefully, read the reports.  They are there for you to read.  Read what is in the family file.  Read about Greg Esparza.  You heard about him.  There is a lot of information for you.

There is bad information in there.  There is information about this past criminal conduct, information about his delinquent conduct, information about running away and having difficulty with rules and difficulty with certain people in his life.  There is a common thread that runs through that, though.  I think you will see that.

When that common thread has to do with what happened to him at age 7, he didn't have any control over what was happening to him, and he was removed from a home which, while it wasn't a nurturing home, was a family setting, and I think you will, as you go through there, you will see how important family was to him, how important his family was to him, the family that I think you will see he perceived as rejecting him.

(Tr. Mit. Hrg. at 179-80).  Both the PSI and mental examination reports contained information that was germane to, and consistent with, the mitigation theory developed by Esparza's trial counsel.  Specifically, the CDTC mental examination report included a discussion of the poverty and abuse that characterized Esparza's childhood, as well as the impact of his numerous foster placements and the death of his mother.  (CDTC Report at 1-2, 5).  In addition, the PSI referred to, and attached a copy of, a PSI prepared several years earlier, which also discussed Esparza's chaotic and disruptive childhood.  (*See* Attachment to PSI Report).

The fact that these reports also contained damaging information does not require a finding that the decision to request them in the first instance was constitutionally deficient performance.  Indeed, faced with similar facts, the Sixth Circuit declined to find ineffective assistance of counsel.  In *Keith v.  Mitchell*, 455 F.3d 662, 671 (6th Cir.  2006), petitioner argued counsel were ineffective during the mitigation phase because they "permitted the jury to see the [presentence report] and a psychological evaluation report that contained negative information

-87-

that was both new to the jury and otherwise inadmissible."  The Sixth Circuit rejected this argument, noting that these reports also contained some favorable information.  Because "[d]efense counsel could have reasonably concluded that this favorable information made it worthwhile to admit these reports," the court found it was not deficient for them to have requested the reports and have them placed before the jury.  *Id*. at 671.

Similarly, in the instant case, although the PSI and CDTC reports at issue did contain some negative information, they also contained information that supported defense counsel's mitigation presentation.  While the Court recognizes these reports may have ultimately harmed Esparza's mitigation case, it cannot find under the highly deferential standard governing habeas review under § 2254(d) that the Ohio Supreme Court's decision on this issue is "so lacking in justification that there was an error well understood and comprehended by existing law beyond any possibility for fairminded disagreement."  *Harrington*, 131 S.Ct. at 786-87.  As the Supreme Court recently emphasized, "*Strickland* does not guarantee perfect representation, only a 'reasonably competent attorney.'"  *Harrington*, 131 S.Ct.  at 791 (quoting *Strickland*, 466 U.S. at 687).  Because "there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight. . . "  *Id*.  "And while in some instances 'even an isolated error' can support an ineffective assistance claim if it is 'sufficiently egregious and prejudicial,' *Murray v.  Carrier*, 477 U.S. 478, 496, 106 S.Ct.  2639, 91 L.Ed.2d 397 (1986), it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy."  *Id*.

Here, Esparza's defense counsel articulated a reasonable mitigation strategy and supported it with the testimony of four witnesses and documentary evidence from Esparza's

Family File.  Although counsel may have later regretted the decision to request the PSI and CDTC reports, it was not unreasonable for the Ohio Supreme Court to find that defense counsel decided to request the PSI and CDTC reports in order to support their mitigation strategy.[28] Accordingly, for the reasons set forth above, the Court finds the Ohio Supreme Court's decision that defense counsel requested the PSI and mental examination reports for strategic reasons, does not constitute an unreasonable application of clearly established federal law.[29]

Even if the decision to request the PSI and mental examination reports did constitute deficient performance, however, the Court finds Esparza has not demonstrated prejudice.  In assessing prejudice under *Strickland*, "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently."  *Harrington*, 131 S.Ct. at 791.

---

[28]    Moreover, the Court rejects Esparza's argument that defense counsel's apparent misunderstanding of the differences between §§ 2929.024 and 2929.03(D) demonstrates deficient performance.  While the Ohio Supreme Court explained in its direct appeal decision that Esparza's counsel held the "erroneous belief" that these provisions are "intertwined," *Esparza*, 39 Ohio St.3d at 9, it is significant to note that the Ohio Supreme Court had not issued a decision on the relationship between these statutes prior to the decision in Esparza's case.  Thus, at the time of Esparza's trial in May 1984, trial counsel did not have the benefit of an Ohio Supreme Court decision regarding these statutes in this particular context.  As set forth *supra*, in determining deficient performance under *Strickland*, this Court must avoid relying on the "harsh light of hindsight" to cast doubt on decisions made by trial counsel and must, instead, "evaluate the [challenged] conduct from counsel's perspective at the time."  *Strickland*, 466 U.S. at 689; *Bell v. Cone*, 535 U.S. 685, 702 (2002).

[29]    The same reasoning applies to Esparza's argument that counsel were ineffective for introducing his Family File (i.e. Joint Exhibit A) during mitigation.  While this exhibit contained some damaging information, it also contained a great deal of evidence that supported counsel's mitigation strategy, including detailed information regarding the poverty, abuse, and neglect Esparza suffered as a child.  Accordingly, the Court finds the Ohio Supreme Court's determination that counsel's decision to introduce the family file was "sound trial strategy" is not contrary to, or an unreasonable application of, clearly established federal law.  *See Keith*, 455 F.3d at 671.

Instead, this Court must ask "whether it is 'reasonably likely' the result would have been different."  *Id.*  (quoting *Strickland*, 466 U.S. at 696).  As the Supreme Court explained, "this does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest of cases.'"  *Id.* at 792 (*Strickland*, 466 U.S. at 693).  The likelihood of a different result must be substantial, not just conceivable.  *Id*.

The Court finds Esparza has failed to demonstrate that it is "reasonably likely" he would not have been sentenced to death but for counsel's decision to request the PSI and mental examination reports.  Even if the PSI and mental examination reports had not been requested and submitted to the jury, the information contained in those reports to which Esparza now objects would necessarily have been presented to the jury through the admission of Esparza's Family File (i.e. Joint Exhibit A).  As discussed *supra*, this Exhibit contained detailed information regarding Esparza's juvenile and adult criminal records, history of drug and alcohol abuse, and previous psychological evaluations diagnosing him with an anti-social personality disorder.  Thus, even in the absence of the PSI and mental examination reports, the jury would have been exposed to this information about Esparza.

Further, the record reflects defense counsel attempted to impeach the reliability of the mental examination report's conclusions by carefully examining psychologists Drs. Seman and Cassell regarding the flaws in the CDTC report.  Specifically, counsel elicited testimony from Dr. Seman that, prior to Esparza's case, the CDTC had only been involved in two mental examinations conducted for purposes of capital mitigation hearings.  (Tr. Mit. Hrg. at 100). Counsel also elicited testimony from both Drs. Seman and Cassell that, while a social worker is

normally involved to obtain records and speak with relevant family members in these types of review, CDTC did not use a social worker in conducting Esparza's mental examination due to the "urgency of the referral." (Tr. Mit. Hrg. at 101-2, 168-69). Both doctors further testified they did not have any discussions with members of Esparza's family or foster parents, and did not have access to psychological testing that may have been conducted by many of the juvenile institutions where Esparza had been committed over the years. (Tr. Mit. Hrg. at 106-7, 169). The Court finds that, through this careful questioning, counsel was able to mitigate the mental examination report's prejudicial effect.

Moreover, the trial court expressly instructed the jury to consider only those mitigating factors specifically raised by Esparza, thus reducing the prejudicial effect of both the PSI and mental examination reports' commentary regarding other mitigating factors that were not specifically raised. Specifically, the trial court instructed the jury that mitigating factors "include, but are not limited to, the nature and circumstances of the offense, the history, character and background of the offender, and any or all of the following factors:" (1) the youth of the offender; (2) whether, at the time of the offense, the offender because of a mental defect lacked substantial capacity to conform his conduct to the requirement of law; and (3) the catch-all factor, i.e. any other factors that are relevant to the issue of whether the offender should be sentenced to death. (Tr. Mit. Hrg. at 212-13). The Court finds that this instruction would have cured any prejudice allegedly stemming from the reports' discussion of mitigating factors not raised by Esparza.

In light of the above, the Court finds Esparza has not demonstrated prejudice; i.e. a reasonable probability that, but for counsel's decision to request the PSI and mental examination

reports, the result of the mitigation proceeding would have been different.

### 3.  Conclusion

Accordingly, and for all the reasons set forth above, the Court finds the state courts' resolution of Esparza's ineffective assistance of counsel during the mitigation phase claims is not contrary to, or an unreasonable application of, clearly established federal law.  The Court, therefore, denies Claim 44 of Esparza's Petition for Writ of Habeas Corpus in its entirety.

### D.  Cumulative Error During the Sentencing Phase Claim (Claim 52)

In his Fifty-Second Claim for Relief, Esparza argues his "convictions and death sentence are unreliable due to the cumulative error that occurred in the trial and sentencing phases and therefore his convictions and death sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments."  (ECF # 12 at 94).

In its October 13, 2000 Opinion & Order, this Court granted this claim with respect to the sentencing phase of Esparza's trial proceedings only.  Specifically, the Court found that "Esparza's counsel's ineffectiveness during the sentencing phase of the trial, coupled with the trial judge's refusal to provide Esparza's counsel with a continuance to prepare for the sentencing phase of the trial, and the prejudicial effect of the blanket admission of the pre-sentence and investigation report, including its psychological aspects, constitute cumulative error sufficient to mandate partial habeas relief."  (ECF # 132 at 150-51).  The Court, thus, held that "Esparza's fifty-second ground for relief, as to the sentencing phase of the proceedings only, is well-taken."  (ECF # 132 at 151).

In his Supplemental Answer, Respondent argues the Court's ruling on this issue must be vacated because the Sixth Circuit has since held that cumulative error claims are not cognizable

on habeas.  (ECF #170 at 21-22).   Esparza concedes that "he cannot identify 'clearly established federal law, as determined by the Supreme Court of the United States' that the Ohio court applied unreasonably or issued a contrary holding in its adjudication of this claim."  (ECF # 174 at 16).

Since this Court issued its previous Opinion & Order in this case, the Sixth Circuit has held that "post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief."  *Moore v.  Parker*, 425 F.3d 250, 256 (6th Cir.  2005).  *See also Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011) (noting that, post-AEDPA, petitioner's cumulative error claim is not cognizable on habeas review); *Hoffner v. Bradshaw*, 622 F.3d 487, 513 (6th Cir. 2010) (same); *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002) (stating that "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief").

Accordingly, the Court finds Esparza's cumulative error during the sentencing phase claim is not cognizable as a matter of law.  Moreover, even if the Court were to address this claim on the merits, it would deny it since "there are simply no errors to cumulate" in light of this Court's analysis of Esparza's denial of continuance and IAC during mitigation claims.  *See Getsy v. Mitchell*, 495 F.3d 295, 317 (6th Cir. 2007) (*en banc*) (citing *Baze v. Parker*, 371 F.3d 310, 330 (6th Cir. 2004)).

## VI.    Certificate of Appealability Analysis

This Court must now determine whether to grant a Certificate of Appealability ("COA") for any of Esparza's remaining grounds for relief; i.e. Claims 39, 44, and 52.  The Sixth Circuit Court of Appeals has determined that neither a blanket grant nor a blanket denial of a COA is an

-93-

appropriate means by which to conclude a capital habeas case as it "undermine[s] the gate

keeping function of certificates of appealability, which ideally should separate the constitutional

claims that merit the close attention of counsel and this court from those claims that have little

or no viability." *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001).  Thus, in concluding this

Opinion, this Court now must consider whether to grant a COA as to either Esparza's Thirty-

Ninth, Forty-Fourth, and/or Fifty-Second Grounds for Relief pursuant to 28 U.S.C. § 2253.

That statute states in relevant part:

> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal
> may not be taken to the court of appeals from --
>
>> (A) the final order in a habeas corpus proceeding in which the detention
>> complained of arises out of process issued by a State court . . .
>
> (2) A certificate of appealability may issue under paragraph (12) only if the
> applicant has make a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253.  This language is identical to the requirements set forth in the pre-AEDPA

statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause.  The sole

difference between the pre- and post-AEDPA statutes is that the petitioner must now

demonstrate he was denied a *constitutional* right, rather than the federal right that was required

prior to the AEDPA's enactment.

The Supreme Court interpreted the significance of the revision between the pre- and

post-AEDPA versions of that statute in *Slack v. McDaniel*, 529 U.S. 473 (2000).  In that case,

the Court held that Section 2253 was a codification of the standard it set forth in *Barefoot v.

Estelle*, 463 U.S. 880 (1983), but for the substitution of the word "constitutional" for "federal"

in the statute.  *Id*. at 483.  Thus, the Court determined,

> [t]o obtain a COA under § 2253(c), a habeas prisoner must make a substantial

-94-

showing of the denial of a constitutional right, a demonstration that, under *Barefoot*, includes showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further."

*Id*. at 483-04 (quoting *Barefoot*, 463 U.S. at 893 n.4).

The Court went on the distinguish the analysis a habeas court must perform depending upon its finding concerning the defaulted status of the claim.  If the claim is not procedurally defaulted, then a habeas court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong."  *Id*. at 484.  A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has determined is procedurally defaulted.  In those instances, the Court opined, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Id*. (emphasis added).

After taking the above standards into consideration, the Court finds that reasonable jurists could debate the Court's conclusions with regard to both Esparza's denial of continuance (Claim 39) and ineffective assistance of counsel during the mitigation phase (Claim 44) claims. The Court, therefore, will issue a COA for Claims 39 and 44 of Esparza's Petition for Writ of Habeas Corpus.  The Court will not issue a COA for Claim 52.  No jurist of reason would debate the Court's conclusion as to this Claim.

## VII.   Conclusion

Pursuant to the United States Supreme Court's decision in *Mitchell v. Esparza*, 540 U.S. 12 (2003), that portion of this Court's October 13, 2000 Opinion & Order granting Claim 1 of Esparza's Petition for Writ of Habeas Corpus is vacated.  In addition, and for the reasons set

forth above, the Court vacates those portions of this Court's October 13, 2000 Opinion & Order

granting Claims 39, 44, and 52.  Upon renewed consideration of these Claims, the Court finds

that Claims 39, 44, and 52 are without merit and denied.  Accordingly, Esparza's Petition for

Writ of Habeas Corpus is denied.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision

could be taken in good faith as to Claims 39 and 44, and the Court issues a certificate of

appealability pursuant to 28 U.S.C. § 2253(c) and Federal Rule Appellate Procedure 22(b) as to

those Claims only.  As to Claim 52, the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that

an appeal from this decision could not be taken in good faith, and that there is no basis upon

which to issue a certificate of appealability.  28 U.S.C. §2253(c); Fed.  R.  App.  P.  22(b).

IT IS SO ORDERED.


 s/ Christopher A. Boyko
CHRISTOPHER A. BOYKO
UNITED STATES DISTRICT JUDGE
DATED:  July 12, 2012